[Civ. No. 18115.   First Dist., Div. One.   Oct. 20, 1959.]

MIRIAM CONNELLY, Appellant, v. VENUS FOODS, INC. (a Corporation) et al., Respondents.

*Assigned by Chairman of Judicial Council.

J. Bruce Fratis and David E. Adelson for Appellant.

Lawrence C. Baker, Michael J. Cullen, Alvin H. Baum, Jr., and Heller, Ehrman, White & McAuliffe for Respondents.

WOOD (Fred B.), J.—*In the first count of the complaint* plaintiff seeks damages for breach by defendant Venus Foods, Inc., of an oral contract under which plaintiff functioned as a distributor of Venus products in Northern California.

Upon the close of plaintiff's case in chief, the trial court took the case from the jury by granting a motion for nonsuit. The judgment states that such action was taken on the first count because the "action therein contained was, and is, unenforceable by the terms of Sub-division I of Section 1624 of the Civil Code and Sub-division I of Section 1973 of the Code of Civil Procedure."

That poses the question: Can it be held, as a matter of law, that this contract is an "agreement that by its terms is not to be performed within a year from the making thereof" (Civ. Code, § 1624, and Code Civ. Proc., § 1973)? The answer is "No."

We begin this inquiry with a brief summary of the circumstances of the making of this contract.

Mrs. Connelly testified that in 1951 she and her husband (who died in 1955) owned and operated Bettermade Foods, a combination of the business of manufacturing and distributing salads and of distributing other food items.

In 1951, while Mr. and Mrs. Connelly were in Los Angeles looking for new products to distribute, they talked with a Mr. Dettra of Venus Foods at the Venus plant. Mr. Dettra, a Venus vice-president, seemed to participate most in the conversation, but Mr. Thorpe, Venus sales manager, was also present. The Connellys told Dettra of their interest in the Venus line, that they wanted to be sure that the Venus product would sell, that they would want an exclusive and more or less permanent distributorship. The Connellys stated that they had eight trucks, a sales manager, and could create a route supervisor and that they were prepared to go all out in promoting the product. Mr. Dettra said that Venus would hesitate to give an exclusive distributorship because Venus had a fig bar in the Safeway chain, so that he would have to let the Connellys know later whether they could obtain an exclusive distributorship. The Connellys stated that they would have to think it over also because they were interested only in an exclusive distributorship.

Mr. Dettra said Venus would give occasional free merchandise but that the Connellys would have to bear the expense of the rest of the promotion. The Connellys said that it would take at least a year of intense promotion and therefore they wanted the line on a permanent and exclusive basis.

A week or two later, Mr. Dettra told the Connellys that Venus had a definite commitment with Safeway. But the Connellys told him that they would take it anyway.

Plaintiff then placed an order with Venus and commenced the business of acting as distributor for Venus Foods in the San Francisco Bay Area and in one or two other areas in Northern California. Asked if she bought merchandise from Venus, plaintiff said ''Yes, we got a great big order; in fact, we kept stocked all the time with a large inventory so that we always have it on hand to sell. . . .'' Upon cross-examination she testified that she ''always carried a large inventory; that's part of the whole distributorship agreement.'' This business and this relationship (at least as to the San Francisco Bay Area) continued until sometime in April, 1956, when plaintiff was notified by Venus over the telephone that her orders would not be filled. Thereafter, about April 13th, plaintiff received a letter from Venus stating that Venus had made new distributorship arrangements and that plaintiff would no longer be supplied with Venus products.

Plaintiff's sales manager testified to the same effect as plaintiff concerning the manner in which Venus terminated its business relationship with plaintiff.

Concerning the duration of the distributorship, plaintiff upon cross-examination testified: ''We said that we wouldn't enter into any agreement whatsoever unless we knew that we could have the item more or less permanently and also on an exclusive basis,'' and that later on the phone it was mentioned again ''that we wanted it on a permanent basis or wouldn't consider it.''

She was then asked if upon deposition she said she did not believe that either she or her husband said anything to Mr. Dettra and Mr. Thorpe about any duration period; that nothing was said in that regard, adding ''you assume it's going to be on and on, to go on indefinitely''; that she just assumed that; and that in the telephone conversation nothing was said in that regard, adding ''I certainly don't recall it. However, we wouldn't have been interested in any short time, you know, anything like that, so it definitely wasn't said''; that after she embarked upon the distributorship she had no further discussion with Venus Foods regarding the duration of the distributorship, concluding with the statement 'it was just assumed that it was a permanent distributorship. Nothing like that was ever mentioned.''

Her counsel stipulated that she did so state upon the taking of her deposition. No explanation was offered concerning the inconsistencies between those statements and her testimony at the trial. This stipulation was made without

any express limitation as to its scope. If it was given as proof of the facts attested by plaintiff upon deposition, there was a conflict of evidence for the jury to resolve. If limited to the purpose of impeachment, it was for the jury to determine the impeaching effect of the statements made upon deposition. (There is no evidence that Mr. Dettra or any other representative of Venus Foods said anything at all about duration.)

In applying the law to this set of facts we should bear in mind that the statute requires a writing only if the agreement "by its terms is not to be performed within a year from the making thereof." (Civ. Code, § 1624.) ▮ Accordingly, it is "well settled that oral contracts invalidated by the statute because not to be performed within a year include those only which *cannot* be performed within that period." (*Hollywood M. P. Equipment Co.* v. *Furer,* 16 Cal.2d 184, 187 [105 P.2d 299].)

▮ The evidence would support findings that we have here an oral contract for a distributorship of indefinite duration, one that involves more than a mere agency or employment (purchase and carrying of a stock of goods, for example) ; i.e., a contract for a reasonable period terminable upon reasonable notice. This evidence would also support findings that such "reasonable period" of contract duration and such "reasonable notice" of termination period were sufficiently brief to enable either party to terminate the contract within one year. Such findings would impel the conclusion that this contract was not within the statute of frauds.

Upon the other hand, the evidence would support findings of opposite import, such as a finding that the parties contracted for performance over a period exceeding one year or a finding that they contracted for an indefinite period, hence for a reasonable period and that a reasonable period under the circumstances exceeded one year. Such findings would impel the conclusion that this contract came within the proscription of the statute of frauds.

These conflicts in the evidence and in the inferences reasonably deducible therefrom presented factual questions for determination by the jury.

We base this analysis upon the recent decision of our Supreme Court in *San Francisco Brewing Corp.* v. *Bowman* (August 10, 1959), 52 Cal.2d 607 [343 P.2d 1], to which we refer for discussion and exposition of the applicable principles of law and review of the pertinent authorities.

The conclusion is inescapable that there were questions of

fact for jury determination on the issue of the applicability or inapplicability of the statute of frauds.

There is evidence that plaintiff made a profit on Venus products, and of the amount thereof each year. That would furnish a sufficient basis for the jury to calculate plaintiff's loss of profits on business lost after defendant's breach and during the period of the reasonable notice of termination that should have been given. Regardless of other possible elements of damages (it is not necessary now to decide what they may be), it is apparent that there is evidence that would support a monetary judgment in favor of plaintiff on the first count.

It was, therefore, error to take from the jury the evidence adduced by plaintiff pursuant to the issues framed under the first count.

■ *In the second count of the complaint*, plaintiffs alleges that Langendorf United Bakeries, Inc., wrongfully induced Venus to break its distributorship contract with plaintiff, and seeks damages therefor.

The trial court granted a nonsuit upon this count for insufficiency of the evidence, as a matter of law, to support a verdict thereon in favor of the plaintiff.

There was some evidence tending to indicate some conduct putatively partaking of that nature by Langendorf but it was strictly limited in its scope. Langendorf's counsel objected that it was hearsay as to Langendorf. Plaintiff's counsel said, "I think that objection is valid." The objection was sustained.

The only other evidence tending to bear upon the issues tendered under the second count consisted of the fact that Langendorf did succeed plaintiff as distributor of Venus products; it had been negotiating with Venus for about two years; during the period of those negotiations Langendorf knew that Venus products were being distributed by plaintiff in the San Francisco Bay Area and that it was contemplated that Langendorf would get the exclusive handling of the entire line of Venus products; and there was but a 10-day period between the execution of the Venus-Langendorf contract and the time operations were to start under it.

Such evidence, obviously, would fall short of furnishing sufficient support for plaintiff on the second count.

■ *In the third count of the complaint*, plaintiff seeks damages from Venus and from Langendorf for loss of shelf

space, at various retailers, for display of products distributed by the plaintiff.

The evidence shows that plaintiff had been able to persuade grocers to allocate to her shelf space for Venus products only. She acquired no right to place products of her choice on the shelves. The grocers looked to Venus products rather than to the identity of the distributor.

Loss of the shelf space was but one aspect of the loss of the contract. If there is an actionable breach, the loss of shelf space is simply one aspect of the loss of expected profits. If the termination is not actionable, the loss of shelf space is not actionable.

Plaintiff also states that defendants deprived plaintiff of the right to distribute merchandise competitive with Venus. After the termination plaintiff attempted unsuccessfully to sell various other competitive brands to her former customers but there is no evidence that either of the defendants attempted to prevent plaintiff from doing so.

We conclude that the nonsuit was properly granted as to the second and third counts but not as to the first count.*

The judgment is reversed as to the first count; affirmed as to the second and third counts.

Bray, P. J., and Tobriner, J., concurred.

---

*No appeal was taken from the remainder of the judgment, a monetary award in favor of Venus against plaintiff upon Venus' cross-complaint, which was coupled with a reservation of jurisdiction to determine whether that award should bear interest for a period of time prior to date of the judgment and a stay of execution of such award, until after the determination of plaintiff's appeals from those portions of the judgments which operated as nonsuits.