[Civ. No. 38629. Second Dist., Div. Five. Dec. 19, 1972.]

JACOB ARONOWICZ et al., Plaintiffs and Appellants, v.
NALLEY'S, INC., Defendant and Appellant.

## COUNSEL

Hafif & Shernoff and Stephen L. Odgers for Plaintiffs and Appellants.

Tremaine, Shenk, Stroud & Roberts, Tremaine, Shenk, Stroud, Wright & Roberts and Hunsdon Cary Stewart for Defendant and Appellant.

## OPINION

**COLE, J.**[*]—Plaintiffs Major Food Products, Inc., Jacob Aronowicz and Samuel Duncan appeal from an order granting the motion of defendant Nalley's, Inc.[1] for a new trial.[2] Nalley's, to protect itself in the event of a reversal of the new trial order, has appealed from the judgment entered in favor of plaintiffs, which awarded $1,000,000 to Major, $70,000 to Aronowicz and $8,000 to Duncan.

The underlying action was in four counts.[3] In the first of these Major sought relief on a breach of contract theory; alternatively in a second count Major proceeded under the doctrine of promissory estoppel. In the third and fourth counts Aronowicz and Duncan respectively sued under promissory estoppel theories.

We have determined that the order granting the new trial must be reversed for failure to comply with the requirements of Code of Civil Procedure section 657 as interpreted in *Mercer* v. *Perez*, 68 Cal.2d 104 [65 Cal.Rptr. 315, 436 P.2d 315], and *Scala* v. *Jerry Witt & Sons, Inc.*, 3 Cal.3d 359 [90 Cal.Rptr. 592, 475 P.2d 864]. Further, on examination of the issues raised by defendant's appeal from the underlying judgment we have determined that the judgment must be affirmed. We turn now to a statement of the facts.

---

[*]Assigned by the Chairman of the Judicial Council.

[1]The actual entity appearing in the court below was "ENVEE, a corporation, erroneously sued herein as NALLEY'S, INC., a corporation, dba X.L.N.T." However, both parties refer to it as "Nalley's Inc." and we shall use here the word "defendant," or the name "Nalley's."

[2]Plaintiffs' notice of appeal is "from the adverse order and judgment entered against plaintiffs." The only judgment adverse to plaintiffs is the portion granting a nonsuit on two counts based on fraud and negligent misrepresentation. Plaintiffs have not argued this subject in their briefs and we deem that part of their appeal to be abandoned. (*Title G. & T. Co.* v. *Fraternal Finance Co.*, 230 Cal. 362, 363 [30 P.2d 515].)

[3]We do not take into account the two counts as to which a nonsuit was granted.

Nalley's was a food distributor, operating through its XLNT division. Duncan was experienced in the packaging and sales fields in connection with the food industry and was employed by a company in the packaging field. Aronowicz had extensive education and experience in directing the manufacture and production of packaged luncheon meats and worked for one of the largest manufacturers of such products in the United States. In 1964 Duncan became aware that Nalley's was interested in procuring a line of sliced meat products to complement the distribution of its own products. Duncan's conversations on this subject with Nalley's were at first general, but gradually became more specific. Duncan also talked with Aronowicz concerning Nalley's interest in distributing a sliced meat line.

In November of 1964, Duncan and Aronowicz caused Major to become incorporated. Further discussions ensued between the individual plaintiffs and defendant as to the possibility of defendant acting as distributor for Major. These discussions continued until, on January 28, 1965, Duncan, on behalf of Major, delivered a written proposal to Duane Maybay of Nalley's who was in charge of product analysis and improvement and the study of new products for defendant. An oral presentation was also made. The letter portion of the document reads as follows: "In line with our conversation of last week, I herewith present our program, in outline form, for your review and confirmation. ¶ Our thanks to you and Mr. Charles Gardiner for taking time out from your busy schedules to discuss our proposed program." The balance of the proposal, entitled "PROPOSED ADOPTIVE SLICED MEAT PROGRAM," was in outline form, occupying over three single spaced, typed pages.[4]

---

[4] The outline was divided into eight parts. Part I listed five domestic products to be included in the program (sliced and corned beef, and sliced turkey, chicken, and ham together with imported Danish cooked ham). Part II gave particular and detailed information as to the weight of each individual package and as to carton and case sizes. This part also stated "12 years experience in manufacturing top grade sliced meat products . . . Self-developed formulas—all cures and spices mixed on our premises to meet our own recipes present—same product quality throughout the year . . . Utilize most advanced equipment and packaging material." Part II also set out the retail product cost for each package.

Part III was headed "Future Products" and listed 17 domestic and five imported items.

Part IV, entitled "Present Market," stated that Los Angeles County was $500,000 plus, Orange County $600,000 plus, and San Diego County $300,000 plus.

Part V described the plant, giving its size and capacity and stating "Facilities constructed to U.S.D.A. standards." Part VI listed seven points relating to quality control. Part VII, headed "Production Schedule," stated among other things "Product within 120 days."

Part VIII was entitled "Distributor Information." It listed the cost of the products by the dozen, and further set out "Grocers cost" at a price later testified by Duncan to have been calculated so as to allow an 18 percent markup to defendant. This price, according to Duncan, followed considerable discussion with defendant, Dun-

All of the things in the oral presentation had been discussed at various times previously, and at the presentation, apparently, a store demonstration program was discussed. Also Aronowicz had met with Charles Gardiner for the first time in January 1965. Gardiner was a vice-president of defendant and general manager of its XLNT division. At that meeting Gardiner asked concerning the people in the Major operation and how things would be financed. Aronowicz told him that there would be stock and loans and that "we were going to apply for loans to the bank provided we get XLNT as the distributor for the products manufactured by our company."

On February 5, 1965, defendant delivered to Duncan a letter, in which among other things defendant agreed to become Major's exclusive Los Angeles and Orange County distributor provided that all factors outlined and represented in the January 28 presentation and outline were fulfilled to the satisfaction of both companies. The letter also said "We also state that should we determine your product line is not as represented or is not compatible with our operation we are free to terminate our agreement within 30 days."[5] The letter was signed by Gardiner, and no claim is made that he lacked authority to write it.

---

can having first offered 12 percent. This part also referred to first selection on new products, stated "Exclusive distributorship covering existing market routes," and discussed product promotions. Another section, labeled "Initial Market Evaluation for Distributor" stated "1st year 500,000. plus dollars," and broke down the amount of packages and pounds per week required by the $500,000 figure. The outline concluded with a section on drivers' advantages.

[5]The full letter is as follows:

"NALLEY'S INC.
"5001 South Soto Street
"Los Angeles 58, California

"February 5, 1965
"Mr. Sam Duncan
"Major Food Products, Inc.

"Dear Sam:

"The distributor goal is to profit from the most effective placement and use of the products, ideas and selling tools provided by a manufacturer.

"The introduction of a new product line requires an investment in valuable time and reputation for the distributor.

"A superior product will not commence and continue to go in the consumer's cart because of quality, price, label and appearance. A strong consumer motivating introduction at store level is required. We have your verbal confirmation of the addition of a strong store demonstration campaign for your products.

"Therefore, we agree to become your exclusive Los Angeles and Orange County area distributor for Major and Viking brands effective with first production, presumably June 7, 1965. This, of course, providing that all factors as outlined and represented in your presentation and written outline of January 28, 1965 are fulfilled to the satisfaction of both companies.

"We also wish to reserve the right to distribute other types of perishable meat products to complete our meat line.

"We also state that should we determine your product line is not as represented or

Prior to the exchange of letters plaintiffs had located a plant suitable for leasing. Twenty-nine days after receiving from defendant its letter of February 5, a lease was signed.[6] Plaintiffs, consulting frequently with representatives of Nalley's, prepared to perform in accordance with their presentation. In late February, with the knowledge and consent of his then employer, Aronowicz took vacation time to go to New York and arrange to procure the Danish ham product. The domestic products were already arranged for. In addition to taking the bare walls of the leased premises and constructing within them a factory capable of producing in quantity the products to be sold by Major, advertising and promotional materials were prepared, machinery was installed, financing was completed and personnel was hired. In the meetings with Nalley's representatives the planned distribution was expanded to include certain "outside distributors" with whom defendant had existing arrangements, and a pricing structure was agreed upon with them. Both Gardiner and others visited Major's premises and expressed satisfaction with the progress being made. Maybay estimated that if 7.2 percent of the total market in XLNT's distribution area could be "captured," $1,000,000 in annual sales would result, at wholesale prices. He felt that Major was going to be a very profitable addition to Nalley's business. In April 1965 Maybay left Nalley's employ and became employed by a third party. He purchased some of Major's stock.

On the financial front, by April 30, 1965, Major had committed or paid out the sum of $102,416 in preparation for commencing business. Major's balance sheet as of June 30, 1965 showed total assets of $436,283. As of that date current liabilities were about $90,000, long term liabilities about $130,000, notes payable almost $175,000 and preproduction expenses of over $42,000 had been incurred.

Full production was achieved by Major, with appropriate governmental

---

is not compatible with our operation we are free to terminate our agreement within 30 days.

"We are looking forward to mutually profitable high volume and share of market with Major, Viking and XLNT.

"Sincerely,

"XLNT Division
"/s/ Charles W. Gardiner
"Charles W. Gardiner, Vice-President
and General Manager
"CWG:ew"

[6] Plaintiffs construed the letter from defendant as giving Nalley's the right to cancel within 30 days of February 5. While some expenditures were incurred by plaintiff Major prior to the expiration of 30 days, in general the larger expenses and long term commitments for the purchase of machinery and the like did not occur until after 30 days had passed.

approvals as to health standards, on June 15, 1965. It was arranged that a meeting would be held on June 23 with defendant's drivers to acquaint them with the product. Signed orders already had been obtained by Nalley's salespeople for Major's products. On June 16, 1965, Gardiner wrote to an executive in Nalley's home offices in the State of Washington. He referred to Major as being "adequately financed and well organized." Its plant was "modern and well equipped." Aronowicz was described as "a very capable individual" and as being responsible for the success of his former employer. In his letter Gardiner then stated that "we propose to become the exclusive distributor for Major." He described the product and its packaging in favorable terms. He stated that Nalley's would increase the sales of its own products in its Los Angeles District by $100,000 a year by adding the Major line, converting now unprofitable retail accounts to profitable ones. He went into detail about the financial benefits to defendant and stated that he personally and the sales organization were enthusiastic.

Apparently Washington thought otherwise. Whatever the reason, on June 22, 1965, Gardiner telephoned Duncan and stated that defendant was not going to distribute Major's products. He gave no reason, either then, or in a visit which Duncan immediately made to him. In his trial testimony Gardiner stated that he had always had "lurking" in his mind questions about Major being able to operate successfully.

Disaster resulted to Major. Immediate efforts were made to secure other distribution, handicapped by the fact that in light of the Nalley's distributorship Major had not developed a sales organization as such, and owned no trucks in which to distribute by itself. Most important it had no market in which to distribute. Although some sales were made through a food broker, and a few other sources, the business faltered. In little more than six months it was through. Eighty percent of the stock was sold to another corporation which was seeking a tax loss. Each shareholder sold his shares for $1, regardless of the amount of shares held. The other corporation operated Major for a short while, but was not prepared to spend the large sums necessary to keep it afloat. With no market for its products Major defaulted on its various commitments to equipment suppliers and others. Machinery was foreclosed and repossessed. The individual plaintiffs and others were sued by a bank on guarantees which they had executed, eventually settling the claims. Major failed to pay its franchise taxes and became suspended as a corporation, a certificate of revivor being secured later, apparently to enable this litigation to be prosecuted.

With this background we turn to a discussion of the issues raised by these appeals.

## The New Trial Order

Nalley's timely moved for a new trial on each of the following grounds: irregularity in the proceedings of the jury; misconduct of the jury; excessive damages; insufficiency of the evidence; verdicts being against the law; and errors in law occurring at the trial.

### Insufficiency of the Evidence and Excessive Damages.

The trial court timely filed a minute order. The order[7] granted the new trial motion on the grounds of excessive damages and insufficiency of the evidence to justify the verdict. This is an adequate specification of the grounds for the court's ruling, as required by Code of Civil Procedure section 657. More is required, however, to sustain the order. ■ The principles are clear and do not require extended exposition; they are set out in section 657, and have been explained in *Mercer* v. *Perez, supra,* 68 Cal.2d 104 and in *Scala* v. *Jerry Witt & Sons, Inc., supra,* 3 Cal.3d 359: When a new trial is granted the court's *reasons* must be set forth, in addition to its grounds (§ 657, *Mercer* v. *Perez,* at pp. 111-112); when the ground is insufficiency of the evidence the trial judge "must briefly recite the respects in which he finds the evidence to be legally inadequate" (*Mercer* v. *Perez,* at p. 116) and "must briefly identify the portion of the record which convinces the judge 'that the court or jury clearly should have reached a different verdict or decision' " (*ibid.*);[8] while the trial judge need

---

[7]"Ruling on Motion for New Trial

"In this matter, heretofore submitted October 26, 1970, the Court now makes the following order;

"Motion for New Trial is granted on the grounds of excessive damages and insufficiency of the evidence to justify the verdict for the following reasons;

"1. The proof of damages was of a speculative and uncertain nature.

"2. The contract was terminable at will, after the expiration of a reasonable time and upon reasonable notice, with no specific period of duration. The evidence failed to show with any degree of probability that the amount of damages awarded by the verdict resulted from the defendant's failure to perform for the period of time required by the contract or by the defendant's promises.

"3. The amount of the verdict as to each plaintiff could be supported only by the inclusion of improper items of damage.

"4. The amount of the verdict can be calculated only by estimated lost profits for an excessive and unreasonable period of itme.

"5. There appears to be no correlation between the amount of the verdict and the damages itemized in the evidence.

"After weighing the evidence the Court states that it is convinced from the entire record, including reasonable inferences therefrom, that the jury clearly should have reached a different verdict.

"Copies of this order mailed to each counsel this date."

[8]The same is true when the ground is excessiveness of damages. See *McLaughlin* v. *City etc. of San Francisco,* 264 Cal.App.2d 310 [70 Cal.Rptr. 782] where the new trial was granted as to damages on the ground of insufficiency of the evidence

not cite page and line, nor discuss the testimony of particular witnesses, nor the weight to be given each item of evidence, he must not merely state his reasons in the terms of conclusions, issues or ultimate facts (*Scala* v. *Jerry Witt & Sons, Inc.*, at p. 370; *Dorsic* v. *Kurtin*, 19 Cal.App.3d 226, 233 [96 Cal.Rptr. 528]) but must supply the reviewing court with information such as to enable it to review in a meaningful way the order granting the new trial (*Scala* v. *Jerry Witt & Sons, Inc.*, at p. 370).

█ We turn, then, to a consideration of whether the instant order is sufficient to meet the commands of section 657. Insofar as the ground of insufficiency of the evidence is concerned, considered independently of any question of damages, *no reasons* at all are set out. The *only* sentence in the entire specification of reasons that does not refer to damages or their amount is found in paragraph 2. It states "The contract was terminable at will, after the expiration of a reasonable time and upon reasonable notice, with no specific period of duration." It probably was itself intended to relate to the damage question since the succeeding sentence in the court's order is contained in the same paragraph 2 and itself refers to damages.[9] Further, the quoted sentence seemingly recognizes that there was a contract between the parties, this itself being an issue as to Major and Nalley.

Looking at the order with reference to damages, both as to their existence and their amount, the reasons stated are no more than statements of ultimate fact at best. None of the paragraphs "briefly identify" any portion of the record or any of the criticized evidence. Paragraph 2 of the order comes the closest. However we are left to speculate as to what the trial court considered to be "the period of time required by the contract" during which Nalley's was obligated to perform. The rest of the paragraphs of the order clearly do not attempt to refer to any of the evidence.[10] Only one of the paragraphs (number 3) recognizes that there is more than one plaintiff in the case. We are left to speculate as to what "proof of damages" (paragaph 1), and what "damages itemized in evidence" (paragraph 5) are referred to. Did the court feel that Major's business was so new and speculative that the *fact* of damages had not been proved at all? Or is it

but the only issue in the case was that of the amount of damages. *McLaughlin* is favorably referred to in *Scala*, 3 Cal.3d at pages 364-365, and page 366, and its order was there characterized as one whose "ground was insufficiency of the evidence to justify an alleged excessive verdict, . . ." (*Scala* v. *Jerry Witt & Sons, Inc.*, at p. 364.)

[9]See footnote 7, *supra*.

[10]In fairness to the trial judge, we note that his order was made only 10 days after the decision in *Scala*, and that that decision disapproved of a number of Court of Appeal decisions which might have influenced the order in this case.

only the *amount*[11] of damages as to which the court found fault with the proof? Did the court disbelieve the investment of $436,000 shown on Major's books, or did it believe that not all of it had been lost? And just where, if at all do the damages to the individual plaintiffs fit in? "Lacking a simple but informative explanation in this regard, we remain in pre-1965 darkness as to the true basis of the court's ruling." (*Scala* v. *Jerry Witt & Sons, Inc., supra,* 3 Cal.3d at p. 369.)

The order granting the new trial must, therefore, be reversed unless there is some other basis, regardless of *Mercer* and *Scala,* why this result should not follow. To save the order, Nalley's asserts that the granting of a new trial did not constitute an abuse of discretion because substantial evidence showed that the damages awarded here were not clearly ascertainable as to their nature or origin. As to the trial court's discretion, wide as it is in ruling on a new trial, failure to comply with the provisions of section 657 of the Code of Civil Procedure nevertheless makes the order a defective one. *Mercer* commented on the trial court's broad powers, and pointed out that one of the very purposes for requiring a specification of reasons was the broadness of this power. It is the failure to exercise it in the procedurally prescribed manner that has caused the error here. As to the substantial evidence argument, we can only point again to the ambiguities in the specification of reasons.

*Other Potential Grounds for a New Trial.*

Nalley's then refers us to the portion of section 657 reading "On appeal from an order granting a new trial the order shall be affirmed if it should have been granted upon any ground stated in the motion, whether or not specified in the order or specification of reasons, . . ."[12] Based on this language, a series of contentions is presented. It will be remembered that the new trial motion was also made on the grounds of jury irregularity and misconduct, and on the grounds that the verdict was against law and that errors in law occurred at the trial, in addition to being made on the grounds of evidence insufficiency and excessive damages.

---

[11]If the occurrence and extent of anticipated profits is shown by evidence of reasonable reliability damages are recoverable, *Grupe* v. *Glick,* 26 Cal.2d 680, 693 [160 P.2d 832]; uncertainty as to the amount of damages is not fatal, *Monroe* v. *Owens,* 76 Cal.App.2d 23, 30 [172 P.2d 110]; uncertainties are to be resolved against Nalley's (*Steelduct Co.* v. *Henger-Seltzer Co.,* 26 Cal.2d 634, 651 [160 P.2d 804].)

[12]For a discussion of this clause and a following proviso which requires us to conclusively presume that, as to insufficiency of the evidence and excessiveness of damages, the order was made only for the reasons specified, see *Treber* v. *Superior Court,* 68 Cal.2d 128 [65 Cal.Rptr. 330, 436 P.2d 330].

(1) Jury irregularity and misconduct.

■ The first argument based on this portion of section 657 is that the jurors "must have reached their conclusion by chance, or by the use of an erroneous yardstick." This assertion is founded only upon a reference to that part of the clerk's transcript which contains a declaration of defendant's counsel reciting a conversation he had with one of the jurors immediately after the verdict. This juror told counsel that the million dollar verdict was based upon the assumption that there were about 100 shareholders of Major and one million dollars seemed about right for that number of shareholders; the juror further said that if the jury had known there were fewer shareholders the verdict would have been less. Aside from the fact that counsel's declaration is the rankest kind of hearsay, the matter recited does not at all show that a verdict was reached by chance. It is only as to such jury conduct that section 657 of the Code of Civil Procedure allows jurors to impeach their verdicts. So far as the matter set out in counsel's declaration is intended to show the mental processes by which the verdict was reached the declaration is inadmissible under Evidence Code section 1150. (See also *People* v. *Hutchinson,* 71 Cal.2d 342 [78 Cal.Rptr. 196, 455 P.2d 132].)

(2) Verdict against the law because of claimed inconsistencies between promissory estoppel and contract.

■ Second, defendant argues that there was insufficient evidence to justify the verdicts because a verdict based on breach of contract is inconsistent with a verdict based on promissory estoppel. If this is in reality an argument based on insufficiency of the evidence it is foreclosed from our consideration by section 657, Code of Civil Procedure. (See also *Treber* v. *Superior Court, supra,* 68 Cal.2d 128, 136-137.) Nalley's, however, urges that the verdicts are against the law for this same reason. This argument is also presented by Nalley's as one of its major propositions in support of its own protective appeal from the judgment. We will treat it in full here. The nub of the argument is that a contract requires (if it is bilateral) a bargained for return promise or (if it is unilateral) a bargained for return act or conduct. On the other hand, the doctrine of promissory estoppel will not come into operation where the act performed is one that has been bargained for. (*Healy* v. *Brewster,* 59 Cal.2d 455, 463 [30 Cal.Rptr. 129, 380 P.2d 817].) The trial court, Nalley's urges, "found" that the letters exchanged between the parties were a "sale." Since a sale is a contract, the reasoning continues, promissory estoppel is unavailable as a remedy. Promissory estoppel was the basis of the only cause of action asserted by the two individual plaintiffs and may have been the cause of action upon which Major received a verdict.

This argument is insufficient, for a number of reasons, to uphold the new trial order or to reverse the judgment based upon the verdict of the jury. Initially, Nalley's misconstrues what the trial court did.[13] From the matter set out in the margin, it is crystal clear that no "finding" was made that there was a contract, and that the issue was left to the jury.

Such a procedure was eminently proper in this case. (See *Posz* v. *Burchell*, 209 Cal.App.2d 324, 335-337 [25 Cal.Rptr. 896].) We note in passing that defendant has adopted completely inconsistent positions from time to time. As shown above, it argued to the trial court that there was no contract as a matter of law. On the factual plane, Gardiner testified that he wanted the letter he sent to plaintiff Major to be sufficiently broad that Nalley's "would be under no obligation to Major or any more than we would to any other prospective distributor." Much of Nalley's closing brief is devoted to arguing that there was no contract because of failure to agree on material terms. Yet despite these positions, its opening brief says "There clearly was a contract between MAJOR and XLNT. It was a distributorship contract conditioned on the continued subjective satisfaction and compatibility of the parties." This argument suited defendant's purpose in contending that promissory estoppel was an inconsistent remedy. With defendant itself adopting such an ambivalent attitude it clearly was not against the law to allow the jury to consider alternative theories of recovery. This is particularly so

---

[13]The trial court did not make any "finding" as such that the relationship between the parties was a contract. Rather, the court was responding to an argument made by Nalley's that there was *no* contract between the parties. Nalley's argument supported its motion to exclude all evidence on the ground that no cause of action was stated in the complaint. In this connection the argument was that there was no consideration to support a contract and no mutuality of obligation. Plaintiffs' contention was that no mutuality of obligation was required under the Uniform Commercial Code. Defendant said that code was inapplicable because there was no sale of goods. The motion having been made, the trial proceeded by stipulation while the court researched the question. In ruling on the motion at a later time the court said that the documents here provided for the prices of the goods to be sold and contained elements of sale. It therefore "interpreted" the document to be a sale and held the Commercial Code to be applicable. At the same time the court *rejected* Nalley's argument that there must be an election of remedies by Major between a contractual and a promissory estoppel cause of action, saying that the jury as trier of the fact should make the election. Next, the trial court rejected plaintiffs' proposed instruction that a contract existed between Major and Nalley's as a matter of law. Conversely, the court also refused to give defendant's proposed instructions that if it was understood that there were undetermined terms of an agreement no contract resulted and that it could be shown that the contract did not come into effect until the happening of some agreed upon event. Next, the court *did* instruct the jury that Major was proceeding "on one of two *alternative* theories, either breach of contract or promissory estoppel." (Italics ours.) Finally, the court flatly instructed that there could not be a recovery on both the theory of breach of contract and that of promissory estoppel and that if the jury found a party entitled to damages for breach of contract he could get none for promissory estoppel.

when, as is the case here, the evidence was ample to uphold a result on either a contractual or promissory estoppel theory insofar as Major was concerned. (Cf. *Gillespie* v. *Rawlings,* 49 Cal.2d 359, 369 [317 P.2d 601], where one proper and one improper theory were each submitted to the jury but the verdict was affirmed because on the record there it was assumed that the jury based its determination on the correct and not the incorrect legal theory.)

The two letters exchanged by Major and Nalley's, plus the subsequent conduct of all involved are sufficient for the jury to have determined that a contract existed. It has some bilateral aspects. Nalley's, of course, clearly made promises in its letter to become the distributor of Major's products upon the happenings and conditions set out therein. While Major made no promises in its initial letter of January 28, Nalley's letter of February 5 itself refers to Major's "verbal confirmation of the addition of a strong store demonstration campaign . . . ." And Nalley's letter also stated that its agreement to become Major's exclusive distributor was made on the provision "that all factors as outlined and represented in your presentation and written outline . . . are fulfilled . . . ." Thus, promises of both parties, bargained for and exchanged could be found to have resulted in a bilateral contract.

It is equally tenable that Nalley's letter might be considered to be an offer to enter into a unilateral contract, Major's acceptance being its conduct in acquiring and building a plant and going into production with the promised product. Major did just this. In such circumstances, the jury could well find that a unilateral contract was formed under the principles set out in Restatement of Contracts, section 45.[14] We treat separately, page 49, *infra,* contentions raised concerning the 30-day termination clause found in Nalley's letter to Major. Nothing else in that letter precludes the potential application of section 45 to the case at hand. The conceptual underpinning of the section is that the main offer includes a promise subsidiary to it, that if part of the asked-for performance is given the offeror will not revoke his offer.

"Whether implied in fact or law, the subsidiary promise serves to preclude the injustice that would result if the offer could be revoked after the offeree had acted in detrimental reliance thereon. Reasonable reliance resulting in a foreseeable prejudicial change in position affords a compelling basis also

---

[14]The section reads: "If an offer for a unilateral contract is made, and part of the consideration requested in the offer is given or tendered by the offeree in response thereto, the offeror is bound by a contract, the duty of immediate performance of which is conditional on the full consideration being given or tendered within the time stated in the offer, or, if no time is stated therein, within a reasonable time."

for implying a subsidiary promise not to revoke an offer for a bilateral contract." (*Drennan* v. *Star Paving Co.,* 51 Cal.2d 409, 414 [333 P.2d 757].)

Defendant Nalley's argues additionally, however, that as to Aronowicz and Duncan the verdicts are against the law because their only causes of action are based on promissory estoppel. The argument assumes that Major's verdict was contractual. Since the assumption is not necessarily true, the argument can be rejected on this basis alone. However, there is another reason for rejecting it. Nalley's pursues the argument with the suggestion that the only remedy of the two individual plaintiffs was to sue as donee or creditor third party beneficiaries of the contract between itself and Major's. But, it says, the individuals were only incidental beneficiaries and have no cause of action as third party beneficiaries. There was, Nalley's argues, no "gratuitous promise" to the two individuals. Plaintiffs, in turn state that whether an incidental beneficiary can sue a promissor on a theory of promissory estoppel (assuming that Major's recovery was based on contract so that there was no gratuitous promise between it and defendant) is a novel question of law. We think that the question is not as novel as plaintiffs urge, and that "promissory estoppel" is not so limited as defendant argues.

The so-called doctrine of promissory estoppel is not given that label by the Restatement of Contracts. Section 90 of the Restatement refers to it as follows:

"PROMISE REASONABLY INDUCING DEFINITE AND SUBSTANTIAL ACTION.

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." It is reliance which is the key to the doctrine and is the substitute for a bargained for consideration. (*Drennan* v. *Star Paving Co., supra,* 51 Cal.2d 409, 414.) As seen above, the original doctrine related only to action or forbearance on the part of a *promisee.* But the law has not stood still. Perhaps recognizing that "the morals of the marketplace" (*Meinhard* v. *Salmon,* 249 N.Y. 458 [164 N.E. 545, 546, 62 A.L.R. 1]) change from time to time and that today stricter standards of good faith and fair dealing are imposed, the authors of the Restatement have proposed to modify section 90 to read as follows:

"PROMISE REASONABLY INDUCING ACTION OR FORBEARANCE.

"A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee *or a third person* and which

does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires." (Rest. 2d Contracts, § 90, Tent. Draft No. 2, 1965; italics added.)

Comment d. states that "If a promise is made to one party for the benefit of another, it is often foreseeable that the beneficiary will rely on the promise. Enforcement of the promise in such cases rests on the same basis and depends on the same factors as in cases of reliance by the promisee. Justifiable reliance by third persons who are not beneficiaries is less likely, but may sometimes reinforce the claim of the promisee or beneficiary."

One of the cases cited by the authors of the tentative draft in support of this proposition is *Burgess* v. *California Mutual B. & L. Assn.,* 210 Cal. 180 [290 P. 1029]. There the defendant trust deed beneficiary promised the trustor by letter, "without investigation and with knowledge that the letter was wanted to further a transaction with a third party" to release a portion of the secured property for the sum of $6,000. The trustor represented to Burgess that the property could be released for the $6,000. The letter was deposited with a title company. Burgess, in reliance upon the letter, lent money to the trustor and took a second trust deed from him. Defendant refused, then, to abide by the promise in its letter and Burgess sued to enjoin a sale under the first trust deed and to secure a reconveyance. The trial court decided against Burgess; the Supreme Court reversed, saying (210 Cal. at p. 189): "In short, the application of the doctrine of estoppel has been made to myriads of different sets of facts and wherever necessary to prevent renunciation from working a fraud upon the party misled, the doctrine is applicable and supplies the absence of a consideration for the promise. Of course, we are not attributing fraudulent intent to respondent but are merely considering the practical effect of its contention if allowed to prevail."

For very similar reasons, and without the attribution of any fraudulent intent to Nalley's we think it abundantly clear that defendant knew that Aronowicz and Duncan were leaving their previous employment, investing and pledging their fortunes and securing the investments of others in substantial amounts to enable themselves to perform under terms of the letters exchanged between the parties. Defendant watched these efforts by plaintiffs, encouraged them, approved of the results and went so far as to commence to secure orders for the products manufactured by Major and to be distributed by defendant. It would be a blemish on the face of justice to allow defendant to now disclaim any responsibility.

(3) Verdict against the law because of antitrust problems.

■ We resume our discussion of Nalley's catalogue of reasons why other grounds asserted in the new trial motion require us to affirm the order granting it. The third argument is that if the verdict is based on a breach of a sale contract it is illegal and unenforceable because it is in violation of the Cartwright Act (Bus. & Prof. Code, §§ 16720 and 16726) as a restraint on trade. This afterthought argument (it was first asserted in Nalley's points and authorities in support of the new trial motion) is not well taken. The first branch of the argument starts with the fact that the jury was instructed on the basis of Commercial Code section 2306, subdivision (2): "A lawful agreement by . . . the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale." From this language Nalley's leaps to the mystifying conclusion that the duty imposed upon it by the agreement constituted a limitation on its right to dispose of Major's products where and to whomever Nalley's chose. We discern no such limitation. Nor does the second part of the argument—that defendant was "required to sell only in certain areas" and that this is an unlawful territorial restriction and a per se violation of the antitrust laws (*U. S.* v. *Arnold, Schwinn & Co.,* 388 U.S., 365 [18 L.Ed.2d 1249, 87 S.Ct. 1856]) impress us. Nowhere in the letters exchanged between the parties do we find any requirement that Nalley's sell only in certain areas. It was Nalley's itself which agreed to be Major's exclusive distributor in Los Angeles and Orange Counties. That provision simply imposed on Major an obligation under Commercial Code section 2306, subdivision (2) to use its best efforts to supply Nalley's with enough goods to fill the demand in this area. Of course it also required Nalley's to try to sell the goods in that area. But nowhere did the agreement preclude Nalley's from selling elsewhere and there is no evidence called to our attention of any other agreements made by Major which in any way would preclude Nalley's from so selling.

(4) Error in law in instructing the jury.

■ (a) Fourthly, Nalley's argues that if the contract is not a sale contract, the court erred in instructing the jury on provisions of the Commercial Code. Defendant makes the bald assertion that these instructions "constituted highly prejudicial error." But it does not say how that result comes about. If the verdict was based upon promissory estoppel, then the whole point fails. And, if the verdict was based upon breach of contract, we do not see why the instructions which referred to the Commercial Code were given in error. The trial court could well determine that the exchange of correspondence here resulted in a contract for the future sale of goods, such a sale being within the scope of division 2 of the Commercial Code.

(b) The fifth point urged by Nalley's to overturn the new trial order is that it was deprived of a fair trial in violation of its due process rights. This far reaching claim is based simply on a charge that the court erred in giving an instruction based upon Civil Code section 1654. The instruction is set out below.[15] Nalley's claim is that the "preceding rules" language refers to sections 1635 to 1653 of the Civil Code and that the jury was not instructed on these rules but rather on many Commercial Code provisions not included in such rules. The point is frivolous. At Nalley's own request the court instructed the jury on Civil Code sections 1644, 1645 and 1649, all of which *are* included within "the preceding rules." Plaintiffs state in their brief, and Nalley's does not contradict the statement in its reply brief, that the instruction based on section 1654 was requested by them only after defendant requested its three instructions.

■ (c) Sixth and last, a convoluted argument, running as follows, is presented: The instructions (dealing with contract formation) under the Commercial Code were erroneous because the parties, by agreement, "abrogated" the Commercial Code. Under section 1102, subdivision (3) of that code its provisions may be varied by agreement. The court ruled that the contract was one of "fancy, taste and judgment" and this implies that the contract is one "wherein a subjective standard is to be applied by the party determining the existence or not of 'compatibility' and 'satisfaction.' " This kind of standard, the argument runs on, is not one imposed by the Commercial Code and therefore it must have arisen by agreement "contrary to" that code.

The reasoning is fallacious. As defendant itself recognizes, the code allows the parties to depart from its terms. The instructions dealing with the Commercial Code merely gave rules of contract formation and interpretation to the jury. Other such rules, not arising from the code were also given at defendant's request. In particular the court instructed the jury (perhaps considerably more favorably than defendant was entitled to) that "the provision in the defendant's letter of February 5, 1965, Exhibit 2, referring to the 'satisfaction of both companies,' involves matters of fancy, taste or judgment and the promisor is the sole judge of his satisfaction regardless of what a reasonable man would do, provided any dissatisfaction is asserted in good faith." Thus the jury was broadly instructed on the law of contract formation. Since the Commercial Code itself recognizes that its provisions of good faith, diligence, reasonableness and care may not be disclaimed by agreement (§ 1102, subd. (3)) the instructions setting

---

[15]"In cases of uncertainty (not removed by the preceeding [*sic*] rules) the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promisor is presumed to be such party; . . ."

out those provisions were perfectly proper. And, once again, the foregoing argument assumes that the verdict was founded on contract when that is not at all necessarily the case.

### The Appeal from the Judgment

We turn then to defendant's appeal from the judgment rendered against it, since by our conclusion that the order granting the new trial must be reversed the judgment is automatically reinstated. One of the two points urged by Nalley's in its attack on the judgment itself is the argument dealing with the claimed inconsistency between a judgment founded on contract and one founded on promissory estoppel, both as to Major and the individual plaintiffs. That point has already been discussed in connection with the order granting the new trial and need not be mentioned any further.

Nalley's other argument as to the judgment is captioned as follows: "Any recovery for breach of contract is erroneous because it was a subjective satisfaction contract terminable on 30-days' notice, or less, and no damages were incurred by Major during the 30 days after cancellation." It embraces a number of subpoints.

### Good Faith of Defendant.

■ The parties spend a good portion of their briefs in arguing whether or not the exchange of letters constituted a "subjective satisfaction" contract.[16] Nalley's argues that the trial court was correct in so holding, and that Nalley's alone could determine whether Major performed to its satisfaction and whether Major's product line was "compatible" with Nalley's. Major takes a contrary position. For two reasons we need not concern ourselves with the issue. The first reason we have applied before: if the jury's verdict was based on promissory estoppel, the controversy is irrelevant.

If contract formed the basis of recovery for Major then, as the trial court instructed the jury, defendant's lack of satisfaction had to be asserted in good faith. Whether Nalley's acted in good faith or not was for the jury. Nalley's now argues that good faith is defined as "honesty of intention" and that "there is not one iota of dishonesty in this record." Further, if the

---

[16]It will be remembered (fn. 5, *supra*), that the letter from Nalley's to Major provided, among other things, that all factors outlined in Major's written and oral presentations should be "fulfilled to the satisfaction of both companies" and that the letter further said "We also state that should we determine your product line is not as represented or is not compatible with our operation we are free to terminate our agreement within 30 days."

Commercial Code definitions of good faith (§ 1201, subd. (19)—honesty in fact; § 2103, subd. (1) (b)—honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade) apply, defendant argues, no evidence shows that its conduct did not meet reasonable commercial standards.

We believe there was ample evidence to support a jury finding of lack of good faith. On June 16, only five days before cancelling the arrangement, Gardiner, who made it on behalf of Nalley's wrote a glowing letter to his superiors about the benefits accruing to Nalley's therefrom. He admitted in his testimony that according to his own calculations the arrangement would develop a net profit to defendant of a little better than 12 percent whereas that year defendant was not making anything over 2½ to 3 percent. Yet the jury had before it a memorandum written to Gardiner from his superior, in Tacoma, the day after the cancellation in which, in addition to other factors, a question is raised as to "the advisability of adding any additional items to our product line, particularly those with low margins." This is not consistent with Gardiner's position. Also, there is evidence in the record that on June 11 Gardiner stated that Nalley's head office in Tacoma had approved the project[17] while the memorandum indicated precisely the contrary. We have already recounted the history of dealings between plaintiffs and defendants, and the facts showing that defendant was aware of plaintiffs' efforts, encouraged them and participated in and approved them, even to the point of having secured orders from customers for the products to be sold by Major to Nalley's. Good faith does import honesty, as the parties agree. And honesty is defined (Webster's New Internat. Dict. (3d ed.)) as "fairness and straightforwardness of conduct . . . sincerity." The jury could well conclude that these attributes were missing from Nalley's conduct. That the trial court granted defendant's motion for nonsuit on plaintiffs' causes of action for fraud and negligent misrepresentation cannot be taken as a finding that there was no evidence of bad faith.

*Right to Terminate "Within 30 Days."*

Defendant next urges that the contract provided that if defendant determined Major's product to be not compatible with defendant's operation "we are free to terminate our agreement within 30 days." Defendant disputes plaintiffs' interpretation of the clause. Defendant says that the clause means within 30 days of Nalley's determination that it is not satis-

---

[17]A document entitled "Discussion of Events re Nalley's Letter of Intent" contains such a statement. It is attached to the minutes of a meeting of Major's board of directors and was admitted into evidence on motion of Nalley's counsel.

fied. Plaintiffs say that the clause means only that defendant had 30 days from the date of its letter of February 5 within which to terminate. While a passing contention is made by Nalley's that this provision is not ambiguous and that therefore this court should determine the meaning of the clause without reference to the oral evidence, it is clear that under prevailing standards it was proper for the meaning of the clause to be the subject of testimony and for the question of termination to be left to the jury (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.,* 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *Delta Dynamics, Inc.* v. *Arioto,* 69 Cal.2d 525 [72 Cal.Rptr. 785, 446 P.2d 785]).

If oral testimony is to be considered, defendant continues, then the provisions of Civil Code section 1649,[18] as to which the court instructed the jury, come into play. Emphasizing only part of the testimony, defendant says its understanding was that the contract was terminable on 30 days' notice at any time. The highly favorable instruction obviously did not advance Nalley's cause in the minds of the jury. This is understandable since the evidence shows that even within the Nalley organization there was no consistency of belief as to the meaning of the term.

When asked what the term "we are free to terminate within 30 days" meant to him, Maybay, who wrote the letter of February 5 where the phrase appears, first replied that "it is a standard termination clause" and "I guess that there are many interpretations." He then said he did not believe the agreement could be terminated only within 30 days of February 5. He admitted that standard cancellation clauses say "upon 30 days written notice" (as opposed to "within 30 days") and that he felt that Major and Nalley's were well on the way to doing business which would be a very profitable addition to Nalley's line.

Gardiner testified that he instructed Maybay to write the letter with standard clauses for termination, and that he meant the beginning date of the termination to be when defendant notified plaintiffs that defendant wanted to cancel. On cross-examination he admitted that "an interpretation" of the cancellation provision would be that Nalley's had to distribute Major's products for at least 30 days after the notice of June 22 was given. Given this state of the evidence the jury could well have resorted to other aids of interpretation. These included the instruction discussed above that uncertainty in contractual language should be construed most strongly against the party who caused the uncertainty to exist (in this case defendant).

---

[18]The section reads "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it."

The trial court further instructed the jury that to terminate a contract whose terms are silent as to its duration a party must give reasonable notice, *and that the termination cannot be effected until the contract has been in effect for a reasonable time.* This instruction accurately states the law. (*Great Western etc.* v. *J. A. Wathen D. Co.,* 10 Cal.2d 442, 447 [74 P.2d 745].) While contracts of employment, whose only consideration is the services to be performed thereunder and which are silent as to duration, are terminable at will upon reasonable notice without regard to duration (*Consolidated Theatres, Inc.* v. *Theatrical Stage Employees Union,* 69 Cal.2d 713, 727, fn. 12 [73 Cal.Rptr. 213, 447 P.2d 325]) this is not such a contract. The rule to be applied here is stated as follows in the *Consolidated* case (69 Cal.2d at pp. 727-728):

"While the initial effort of the court, in construing contracts of continuing performance or forbearance which contain no express term of duration, must always be that of implying a term of duration commensurate with the intentions of the parties, in some cases the nature of the contract and the totality of surrounding circumstances give no suggestion as to any ascertainable term. In such cases the law usually [fn. 12 omitted] implies that the term of duration shall be at least a reasonable time, and that the obligations under the contract shall be terminable at will by any party upon reasonable notice after such a reasonable time has elapsed. (See generally 17A C.J.S., Contracts, § § 385(1), 398, pp. 457, 480; Am.Jur.2d, Contracts, § 486, pp. 955-957; 1 Williston on Contracts, *supra,* § 38, pp. 112-117.) This rule is generally applicable, for instance, to exclusive sales agency and distributorship contracts.[13] (See *J. C. Millett Co.* v. *Park & Tilford Distillers Corp.* (N.D. Cal. 1954) 123 F.Supp. 484, 492-493; *San Francisco Brewing Corp.* v. *Bowman* (1959) 52 Cal.2d 607, 613-614 [343 P.2d 1]; *Great Western Distillery Products, Inc.* v. *John A. Wathen Distillery Co.* (1937) 10 Cal.2d 442, 447 [74 P.2d 745]; *Connelly* v. *Venus Foods, Inc.* (1959) 174 Cal.App.2d 582, 586 [345 P.2d 117]; *Mangini* v. *Wolfschmidt, Ltd., supra,* 165 Cal.App.2d 192, 202 [331 P.2d 728]; 9 Wil-

---

"[13]Exclusive agency and distributorship contracts are treated differently from simple employment contracts because the former involve consideration in addition to the services to be rendered thereunder. ' "When the obligor has expended a substantial sum of money or value or has substantially rearranged his business . . . preparatory to engaging upon the terms of agreement for the benefit of obligee, he ought, through fairness, to have a reasonable time and notice of the cancellation of the contract in order that he might have a reasonable opportunity to put his house in order." ' (9 Williston on Contracts, *supra,* § 1017A, pp. 150-151, quoting from *Elson & Co.* v. *Beselin & Son* (1928) 116 Neb. 729, 735 [218 N.W. 753]; see also *J. C. Millett Co.* v. *Park & Tilford Distillers Corp.* (N.D. Cal. 1954) 123 F.Supp. 484, 492; *San Francisco Brewing Corp.* v. *Bowman* (1959) 52 Cal.2d 607, 613-614 [343 P.2d 1]; *Connelly* v. *Venus Foods. Inc.* (1959) 174 Cal.App.2d 582, 586-587 [345 P.2d 117].)"

liston on Contracts, *supra*, § 1017A, pp. 137-169; see generally Annot., 19 A.L.R.3d 196.)" ■ Thus, applying these rules, the jury could properly find in light of all of the circumstances that Nalley's abrupt termination of the contract not only violated the requirement that reasonable notice be given (in this case possibly but not necessarily 30 days) but also the requirement that the contract first should have had a reasonable term of duration.

*Damages Resulting from Termination.*

■ This leads us directly to the last argument posited by Nalley's—that no damages resulted from termination of the relationship between it and Major. This argument is really an improperly conceived attack on the weight of the evidence. It is based on the facts that Major secured a food broker to try to handle its production when defendant so quickly cancelled, that for the first month the food broker's sales exceeded estimates previously made for Nalley's, that meat prices rose, and that Major's corporate minutes show many complaints about under-handed and unfair competition on the part of third parties which caused a loss of business. These, of course, were all legitimate factors for the jury to consider. Aside from pointing to these facts, Nalley's does not specifically claim that Major did not suffer damages. The jury could properly consider the expenses incurred in establishing Major's plant and readying for production. They totalled over $436,000. The reasonably anticipated profits (the jury was properly instructed that only profits which plaintiffs established with reasonable certainty could be considered and that speculative damages could not be awarded) of Major could be taken into account. In evidence was a budget filed by Major with the Corporations Commissioner which estimated, just on the basis of defendant's distributorship commitment, a monthly profit to Major, before depreciation, of $5,360. This figure was the product of budgetary estimates by plaintiff Aronowicz, who had extensive experience in the food processing business. This estimate dealt only with the Los Angeles County and Orange County distributorship agreed to by Nalley's which Major had estimated would produce $500,000 in annual sales. There also was evidence in the record that Nalley's and Major had discussed with each other expanding the proposed territory to include all of California, Phoenix, Arizona, and Las Vegas, Nevada, and Maybay of Nalley's had estimated sales by Nalley's in California, Arizona and Nevada of one million dollars annually. Since the profit projection filed with the Corporations Commissioner had not included any expanded territory, the figure could be expected to be considerably enlarged with the addition of the other territory. The minimum time which was reasonably required to elapse (*Consolidated Theatres, Inc.* v. *Theatrical Stage Employees Union, supra,* 69 Cal.2d 713) before Nalley's

could terminate, and during which Major would have been earning profits, was a question of fact (*Mangini* v. *Wolfschmidt, Ltd., supra,* 165 Cal.App. 2d 192, 212 [331 P.2d 728]) for the jury to determine. (*Connelly* v. *Venus Foods, Inc.,* 174 Cal.App.2d 582, 586 [345 P.2d 117].) Considering the size of the investment in Major which was lost the jury could have found this to be a period of years. In addition, Major had had plans to package food products for various chain stores using the customers' label, and this was expected to produce substantial income. Still other operations had also been contemplated. As to the individual defendants, their personal damages were amply established.

 "Where the promisor, by his wilful breach of contract, has given rise to the difficulty of proving the amount of loss of profits, it is proper to require of the promisee only that he show the amount of damages with reasonable certainty, and to resolve uncertainties against the promisor. . . . 'While Civil Code, section 3301, provides that no damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin, the fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery.' " (*Mahoney* v. *Founders' Ins. Co.,* 190 Cal. App.2d 430, 436-437 [12 Cal.Rptr. 114].) Likewise for the jury to consider were the circumstances forcing Major to eventually shut down its operations, including the difficulty of establishing a business such as Major's in the absence of an arrangement for distribution. We cannot hold that no damages were sustained.

The order granting the new trial is reversed. The judgment in favor of plaintiffs is affirmed.

Kaus, P. J., and Ashby, J., concurred.

A petition for a rehearing was denied January 8, 1973, and the petition of the defendant and appellant for a hearing by the Supreme Court was denied February 22, 1973. Molinari, J.,* participated therein. Wright, C. J., Mosk, J., and Burke, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairman of the Judicial Council.