**BERLINER FOODS CORPORATION, et al.**

v.

**The PILLSBURY COMPANY, et al.**

**Civ. No. JFM–86–1040.**

United States District Court, D. Maryland.

April 22, 1986.

James P. Ulwick, Kramon & Graham, Baltimore, Md., and Brendan V. Sullivan, Jr., Williams & Connolly, Washington, D.C., for plaintiffs.

Shelly E. Mintz, Joseph, Greenwald & Laake, Hyattsville, Md., and Stanley M. Gorinson, Pillsbury, Madison & Sutro, Washington, D.C., for defendants.

## MEMORANDUM

MOTZ, District Judge.

This action arises from defendants' termination of Berliner Foods Corporation as a distributor of Haagen-Dazs Ice Cream after the Berliner family sold Berliner Foods to Dreyer's Grand Ice Cream, Inc. Plaintiffs seek injunctive relief as well as monetary damages. On March 31, 1986 this Court denied a temporary restraining order which would have prohibited defendants from terminating the distributorship. Since that time the parties have engaged in expedited discovery and on April 17th a preliminary injunction hearing was held.

Initially, when they requested the temporary restraining order, plaintiffs were seeking an order naming them as the exclusive distributor for Haagen-Dazs in the geographic area which they had previously served. The preliminary injunction for which they pray would be more limited in scope, requiring defendants to maintain them only as a non-exclusive distributor.

The motion for preliminary injunction will be denied.

In or about 1974 Berliner Foods first became a distributor for Haagen-Dazs Ice Cream.[1] It is undisputed that the agreement was oral. According to plaintiffs, Reuben Mattus, then the owner of the Haagen-Dazs Company, promised that they would remain as Haagen-Dazs distributors as long as they met Haagen-Dazs' performance standards. Plaintiffs concede that the subject of a transfer of the ownership of the distributorship was not discussed between Mattus and themselves. Over the next decade both parties flourished through their relationship. The concept of manufacturing and marketing high quality and high priced ice cream took hold (despite initial resistance to it) and the Berliners successfully promoted the sale of Haagen-Dazs to supermarket chains and other retailers in the Baltimore-Washington area.

In 1983 the Pillsbury Company acquired Haagen-Dazs. Although the Berliners (as well as other Haagen-Dazs distributors throughout the country) were concerned as to whether Pillsbury would adhere to the oral distribution agreements which they had made with Reuben Mattus, Berliner Foods remained as a distributor for Haagen-Dazs. It was notably successful, and Pillsbury indicated interest in buying the Berliners out. However, in December 1985 the Berliners entered into a contract to sell Berliner Foods not to Pillsbury but to Dreyers, the manufacturer of a premium ice cream which has heretofore been sold primarily in the western part of the United

---

1. The first agreement related to the distribution of Haagen-Daz pints. In 1982, a subsequent agreement was entered into under which the Berliners were to store and distribute two and a half gallon and one and a half gallon bulk ice cream products. The 1982 agreement provides that it is terminable upon the will of either party upon thirty days' written notice.

States. Dreyers is attempting to expand its market to the east and chose to purchase Berliner Foods as the means to effect distribution in the mid-Atlantic region.[2]

The Berliners did not advise Pillsbury of the sale of Berliner Foods to Dreyers until after the sale was final. When Pillsbury learned of the sale, it advised Berliner Foods that its distributorship for Haagen-Dazs would be terminated. Pillsbury indicated to Berliner Foods, as it contends in this suit, that it did not want the distribution of Haagen-Dazs to be in the control of a distributor owned by one of its competitors.

Plaintiffs, drawing a distinction between "premium" ice cream and "super premium" ice cream, contend that Dreyers and Haagen-Dazs are not competitors. They point to the fact that Dreyers and Haagen-Dazs, with Pillsbury's knowledge and consent, have shared distributors in other areas. Pillsbury responds that while it did agree to share a distributor with Breyers in northern California, it did so only on an experimental basis and that it has decided—and has so advised Dreyers—that this relationship is to be discontinued. Dreyers and Haagen-Dazs are very much in competition, asserts Pillsbury, not only in the ultimate consumer market but also in the interim market for display and storage of their products in retailers' freezers.

The Fourth Circuit has ruled that in deciding whether or not to issue a preliminary injunction in a case where "serious issues" are presented, a court should "balance the 'likelihood' of irreparable harm to the plaintiff against the 'likelihood' of harm to the defendant; ... the importance of probability of success increases as the probability of irreparable injury diminishes, ... and where the latter may be characterized as simply 'possible,' the former can be decisive. Even so, it remains merely one 'strong factor' to be weighed along side both the likely harm to the defendant and the public interest." *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 194–95 (4th Cir.1977).[3] In a case such as this, where the stakes are high and plaintiffs are represented by able counsel, it is difficult to say that the issues presented are not "serious" ones. However, it seems clear that plaintiffs will not prevail on the merits.

■ It is one thing to say, as plaintiffs allege and as can be presumed for present purposes, that Reuben Mattus told the Berliners that they could remain as distributors as long as they met performance standards. It is quite another thing to say, as plaintiffs further argue, that by virtue of such a representation the Berliners were free to sell their distributorship to anyone whom they chose without the prior approval of Haagen-Dazs. It is hornbook law that contracts calling for the performance of personal services, including distributorship agreements, which are silent regarding assignments, cannot be assigned without the prior consent of the other contracting party. *See Crane Ice Cream Co. v. Terminal Freezing & Heating Co.*, 147 Md. 588, 128 A. 280 (1925); *Wetherell Bros. Co. v. United States Steel Co.*, 105 F.Supp. 81, 85 (D.Mass 1952), *aff'd*, 200 F.2d 761, 763 (1st Cir.1953). Further, it defies common sense to require a manufacturer to leave the distribution of its prod-

---

**2.** Because of the similarity of the name "Dreyers" with the name "Breyers," Dreyers' chief competitor in the east, Dreyers has decided to sell its ice cream under the name "Edy's" there.

**3.** There is a threshold question in this case as to whether the *Blackwelder* analysis should even be applied. Although the standards for issuing a preliminary injunction have arguably been weakened over the years, a preliminary injunction remains an extraordinary remedy, the *sine qua non* for which should be the inadequacy of any remedy at law. *See Roland Machinery Co. v. Dresser Indus.*, 749 F.2d 380, 386 (7th Cir.

1984). Here, plaintiffs have themselves belied a contention that monetary relief cannot effectively be had. The contract between Dreyers and the Berliners for the sale of Berliner Foods provides that the basic sales price is 4.6 million dollars and that an additional 3.7 million dollars is to be paid in the event that it is determined that the Haagen-Daz distribution rights can be transferred. The 3.7 million dollar figure provides a basis—at least an outside basis—for an award of monetary damages in the event that plaintiffs should ultimately prevail.

ucts to a distributor under the control of a competitor or potential competitor. *Cf. J.H. Westerbeke Corp. v. Onan Corp.*, 580 F.Supp. 1173 (D.Mass.1984); *Morilla, Inc. v. M. Grumbacher, Inc.*, 1983–2 Trade Cas. (CCH) par. 65,499 (D.Mass.1983).[4]

■ The balancing of the respective irreparable harms to the parties by the issuance or non-issuance of the preliminary injunction also argues in favor of denial of the injunction. If the injunction is not issued, there will be no legal obstacle to Berliner Foods distributing ice cream for Dreyers. Plaintiffs argue that the effectiveness of Berliner Foods distribution efforts might be hampered by the fact that it will not also be distributing Haagen-Dazs. However, Berliner Foods and Dreyers both knew when they entered into their contract that this was a distinct possibility—the contract expressly contemplates that the right to distribute Haagen-Dazs might not survive the sale of the distributorship.

Defendants, on the other hand, would be substantially injured by requiring them to continue Berliner Foods as a distributor. Dreyers is aggressively entering the Mid-Atlantic market and this will be a time of intense competition among ice cream manufacturers for the freezer space of the retailers. During this period defendants need a distributor of whose loyalty they can be assured, both for maintaining short term sales and establishing long term ties with retailers. Moreover, the Good Humor Company, the defendants' new distributor, is new to the Haagen-Dazs product and the confusion caused by a dual distribution system just as Good Humor is coming on board might well have detrimental effects in the marketing of Haagen-Dazs.

■ The final factor to be taken into account is, to the extent that it exists independently of other considerations, the public interest. Plaintiffs seek to invoke that interest on their behalf by arguing that they are the champions of other Haagen-Dazs distributors throughout the United States whose rights Pillsbury is attempting to violate by imposing as a condition to the transfer of a distributorship prior approval by Pillsbury. Of course, it is really Dreyers' own interest which Dreyers is seeking to further. It wants to be free to take over Haagen-Dazs distributors in order to capitalize upon the relationships which those distributors have built up (on behalf of Haagen-Dazs) with retailers over the years. Furthermore, while Dreyers alleges that Pillsbury is following a cynical strategy to exploit Haagen-Dazs distributors, specifically to deprive them of the value of the goodwill which they have been able to generate in their businesses, plaintiffs have produced no substantial evidence of that fact. Given the history of the relationship between Haagen-Dazs and its distributors, it may well be that the distributors have rights greater than those which inhere in a simple at will arrangement. However, on the state of this record there is no reason to believe that at the inception of their relationship, Reuben Mattus and the distributors contemplated, discussed or intended that the distributors would have the right to undermine the Haagen-Dazs operation by selling their distributorship to a Haagen-Dazs competitor. Indeed, this would have been contrary to the very relationship of mutual trust which plaintiffs allege to have existed between Mattus and the distributors.

A separate order denying plaintiffs' motion for preliminary injunction is being entered herewith.

---

**4.** Plaintiffs also argue a theory of promissory estoppel. Assuming that under Maryland law promissory estoppel can be applied to make enforceable an agreement which is unenforceable under the law of contracts, there is no promissory estoppel here. First, on the facts as they have thus far been developed, the Court does not find that the Berliners were promised that they could sell their distributorship to a Haagen-Dazs competitor. Second, the Berliners have been handsomely paid by Dreyers for the reliance damages which they claim—capital investment in their business—and Dreyers has obtained an active distributorship in exchange. Third, Berliner Foods' most recent investment in the expansion of storage space—which plaintiffs heavily stressed in first advancing their promissory estoppel argument—was made in contemplation of the sale of the distributorship to Dreyers.