SALLY BEAUTY COMPANY, INC., a
Delaware corporation,
Plaintiff-Appellant,

v.

NEXXUS PRODUCTS COMPANY, INC.,
a California corporation,
Defendant-Appellee.

No. 85–2039.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 11, 1986.

Decided Sept. 26, 1986.

See also, D.C., 578 F.Supp. 178.

Michael Sennett, Bell Boyd & Lloyd, Chicago, Ill., for plaintiff-appellant.

John R. McCambridge, Reuben & Proctor, Chicago, Ill., for defendant-appellee.

Before CUDAHY and POSNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

CUDAHY, Circuit Judge.

Nexxus Products Company ("Nexxus") entered into a contract with Best Barber & Beauty Supply Company, Inc. ("Best"), under which Best would be the exclusive distributor of Nexxus hair care products to barbers and hair stylists throughout most of Texas. When Best was acquired by and merged into Sally Beauty Company, Inc. ("Sally Beauty"), Nexxus cancelled the agreement. Sally Beauty is a wholly-owned subsidiary of Alberto-Culver Compa-

ny ("Alberto-Culver"), a major manufacturer of hair care products and a competitor of Nexxus'. Sally Beauty claims that Nexxus breached the contract by cancelling; Nexxus asserts by way of defense that the contract was not assignable or, in the alternative, not assignable to Sally Beauty. The district court granted Nexxus' motion for summary judgment, ruling that the contract was one for personal services and therefore not assignable. We affirm on a different theory—that this contract could not be assigned to the wholly-owned subsidiary of a direct competitor under section 2–210 of the Uniform Commercial Code.

## I.

Only the basic facts are undisputed and they are as follows. Prior to its merger with Sally Beauty, Best was a Texas corporation in the business of distributing beauty and hair care products to retail stores, barber shops and beauty salons throughout Texas. Between March and July 1979, Mark Reichek, Best's president, negotiated with Stephen Redding, Nexxus' vice-president, over a possible distribution agreement between Best and Nexxus. Nexxus, founded in 1979, is a California corporation that formulates and markets hair care products. Nexxus does not market its products to retail stores, preferring to sell them to independent distributors for resale to barbers and beauticians. On August 2, 1979, Nexxus executed a distributorship agreement with Best, in the form of a July 24, 1979 letter from Reichek, for Best, to Redding, for Nexxus:

Dear Steve:

It was a pleasure meeting with you and discussing the distribution of Nexus Products. The line is very exciting and we feel we can do a substantial job with it—especially as the exclusive distributor in Texas (except El Paso).

If I understand the pricing structure correctly, we would pay $1.50 for an item that retails for $5.00 (less 50%, less 40% off retail), and Nexus will pay the freight charges regardless of order size. This approach to pricing will enable us to price the items in the line in such a way that they will be attractive and profitable to the salons.

Your offer of assistance in promoting the line seems to be designed to simplify the introduction of Nexus Products into the Texas market. It indicates a sincere desire on your part to assist your distributors. By your agreeing to underwrite the cost of training and maintaining a qualified technician in our territory, we should be able to introduce the line from a position of strength. I am sure you will let us know at least 90 days in advance should you want to change this arrangement.

By offering to provide us with the support necessary to conduct an annual seminar (ie. mailers, guest artisit [sic]) at your expense, we should be able to reenforce our position with Nexus users and introduce the product line to new customers in a professional manner.

To satisfy your requirement of assured payment for merchandise received, each of our purchase orders will be accompanied by a Letter of Credit that will become negotiable when we receive the merchandise. I am sure you will agree that this arrangement is fairest for everybody concerned.

While we feel confident that we can do an outstanding job with the Nexus line and that the volume we generate will adequately compensate you for your continued support, it is usually best to have an understanding should we no longer be distributing Nexus Products—either by our desire or your request. Based on our discussions, cancellation or termination of Best Barber & Beauty Supply Co., Inc. as a distributor can only take place on the anniversary date of our original appointment as a distributor—and then only with 120 days prior notice. If Nexus terminates us, Nexus will buy back all of our inventory at cost and will pay the freight charges on the returned merchandise.

Steve, we feel that the Nexus line is exciting and very promotable. With the program outlined in this letter, we feel it

can be mutually profitable and look forward to a long and successful business relationship. If you agree that this letter contains the details of our understanding regarding the distribution of Nexus Products, please sign the acknowledgment below and return one copy of this letter to me.

Very truly yours,

/s/ Mark E. Reichek

President

Acknowledged /s/ Stephen Redding Date 8/2/79. Appellant's Appendix at 2–3.

In July 1981 Sally Beauty acquired Best in a stock purchase transaction and Best was merged into Sally Beauty, which succeeded to Best's rights and interests in all of Best's contracts. Sally Beauty, a Delaware corporation with its principal place of business in Texas, is a wholly-owned subsidiary of Alberto-Culver. Sally Beauty, like Best, is a distributor of hair care and beauty products to retail stores and hair styling salons. Alberto-Culver is a major manufacturer of hair care products and, thus, is a direct competitor of Nexxus in the hair care market.[1]

Shortly after the merger, Redding met with Michael Renzulli, president of Sally Beauty, to discuss the Nexxus distribution agreement. After the meeting, Redding wrote Renzulli a letter stating that Nexxus would not allow Sally Beauty, a wholly-owned subsidiary of a direct competitor, to distribute Nexxus products:

As we discussed in New Orleans, we have great reservations about allowing our NEXXUS Products to be distributed by a company which is, in essence, a direct competitor. We appreciate your argument of autonomy for your business, but the fact remains that you are totally owned by Alberto-Culver.

Since we see no way of justifying this conflict, we cannot allow our products to be distributed by Sally Beauty Company. Appellant's Appendix at 475.

In August 1983 Sally Beauty commenced this action by filing a complaint in the Northern District of Illinois, claiming that Nexxus had violated the federal antitrust laws and breached the distribution agreement. In August 1984 Nexxus filed a counterclaim alleging violations of the Lanham Act, the Racketeer Influenced and Corrupt Organizations Act ("RICO") and the unfair competition laws of North Carolina, Tennessee and unidentified "other states." On October 22, 1984 Sally Beauty filed a motion to dismiss the counterclaims arising under RICO and "other states' law." Nexxus filed a motion for summary judgment on the breach of contract claim the next day.

The district court ruled on these motions in a Memorandum Opinion and Order dated January 31, 1985. It granted Sally's motion to dismiss the two counterclaims and also granted Nexxus' motion for summary judgment. In May 1985 it dismissed the remaining claims and counterclaims (pursuant to stipulation by the parties)[2] and directed the entry of an appealable final judgment on the breach of contract claim.

II.

Sally Beauty's breach of contract claim alleges that by acquiring Best, Sally Beauty succeeded to all of Best's rights and obligations under the distribution agreement. It further alleges that Nexxus breached the agreement by failing to give Sally Beauty 120 days notice prior to terminating the agreement and by terminating it on other than an anniversary date of its formation. Complaint, Count III, Appellant's Appendix at 54–55. Nexxus, in its motion for summary judgment, argued that the distribution agreement it entered into

---

1. The appellant does not appear to dispute the proposition that Alberto-Culver is Nexxus' direct competitor, *see* Reply Brief at 8–10; rather it disagrees only with Nexxus' contention that performance by Sally Beauty would necessarily be unacceptable. *See infra.*

2. One of the two antitrust counts had already been dismissed by stipulation of the parties in May 1984.

with Best was a contract for personal services, based upon a relationship of personal trust and confidence between Reichek and the Redding family. As such, the contract could not be assigned to Sally without Nexxus' consent.

In opposing this motion Sally Beauty argued that the contract was freely assignable because (1) it was between two corporations, not two individuals and (2) the character of the performance would not be altered by the substitution of Sally Beauty for Best. It also argued that "the Distribution Agreement is nothing more than a simple, non-exclusive contract for the distribution of goods, the successful performance of which is in no way dependent upon any particular personality, individual skill or confidential relationship." Appellant's Appendix at 119.

In ruling on this motion, the district court framed the issue before it as "whether the contract at issue here between Best and Nexxus was of a personal nature such that it was not assignable without Nexxus' consent." It ruled:

> The court is convinced, based upon the nature of the contract and the circumstances surrounding its formation, that the contract at issue here was of such a nature that it was not assignable without Nexxus's consent. First, the very nature of the contract itself suggests its personal character. A distribution agreement is a contract whereby a manufacturer gives another party the right to distribute its products. It is clearly a contract for the performance of a service. In the court's view, the mere selection by a manufacturer of a party to distribute its goods presupposes a reliance and confidence by the manufacturer on the integrity and abilities of the other party.... In addition, in this case the circumstances surrounding the contract's formation support the conclusion that the agreement was not simply an ordinary commercial contract but was one which was based upon a relationship of personal trust and confidence between the parties. Specifically, Stephen Redding, Nexxus's

vice-president, travelled to Texas and met with Best's president personally for several days before making the decision to award the Texas distributorship to Best. Best itself had been in the hair care business for 40 years and its president Mark Reichek had extensive experience in the industry. It is reasonable to conclude that Stephen Redding and Nexxus would want its distributor to be experienced and knowledgeable in the hair care field and that the selection of Best was based upon personal factors such as these.

Memorandum Opinion and Order at 56 (citation omitted). The district court also rejected the contention that the character of performance would not be altered by a substitution of Sally Beauty for Best: "Unlike Best, Sally Beauty is a subsidiary of one of Nexxus' direct competitors. This is a significant distinction and in the court's view, it raises serious questions regarding Sally Beauty's ability to perform the distribution agreement in the same manner as Best." *Id.* at 7.

■ We cannot affirm this summary judgment on the grounds relied on by the district court. Under Fed.R.Civ.P. 56(c) summary judgment may be granted only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The burden on the movant is stringent: "all doubts as to the existence of material fact must be resolved against the 'movant." *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1339 (7th Cir.1985), *quoting Dreher v. Sielaff,* 636 F.2d 1141, 1143 n. 4 (7th Cir.1980). Nexxus did not meet its burden on the question of the parties' reasons for entering into this agreement. Although it might be "reasonable to conclude" that Best and Nexxus had based their agreement on "a relationship of personal trust and confidence," and that Reichek's participation was considered essential to Best's performance, this is a finding of fact. *See Phillips v. Oil, Inc.,* 104 S.W.2d 576, 579 (Tex.Civ.App.1937, writ ref'd n.r.e.) (question whether contract was entered into because of parties' "personal

confidence and trust" is for the determination of trier of fact). Since the parties submitted conflicting affidavits on this question,[3] the district court erred in relying on Nexxus' view as representing undisputed fact in ruling on this summary judgment motion. *See Cedillo v. Local 1, International Association of Bridge & Structural Iron Workers,* 603 F.2d 7, 11 (7th Cir.1979) ("questions of motive and intent are particularly inappropriate for summary adjudication").[4]

■ We may affirm this summary judgment, however, on a different ground if it finds support in the record. *United States v. Winthrop Towers,* 628 F.2d 1028, 1037 (7th Cir.1980). Sally Beauty contends that the distribution agreement is freely assignable because it is governed by the provisions of the Uniform Commercial Code (the "UCC" or the "Code"), as adopted in Texas.[5] Appellants' Brief at 46–47. We agree with Sally that the provisions of the UCC govern this contract and for that reason hold that the assignment of the contract by Best to Sally Beauty was barred by the UCC rules on delegation of performance, UCC § 2–210(1), Tex.Bus & Com.Code Ann. § 2–210(a) (Vernon 1968).

### III.

■ The UCC codifies the law of contracts applicable to "transactions in goods." UCC § 2–102, Tex.Bus. & Com. Code Ann. § 2–102 (Vernon 1968). Texas applies the "dominant factor" test to determine whether the UCC applies to a given contract or transaction: was the essence of or dominant factor in the formation of the contract the provision of goods or services? *Montgomery Ward & Co., Inc. v. Dalton,* 665 S.W.2d 507, 511 (Tex.App.1984) (contract for repair of roof predominantly involves services); *Garcia v. Rutledge,* 649 S.W.2d 307, 310 (Tex.App.1982) (contract for repair of truck predominantly a contract for services); *Potts v. W.Q. Richards Memorial Hospital,* 558 S.W.2d 939, 946 (Tex.Civ.App.1977) (essence of hospital stay is the furnishing of services); *Freeman v. Shannon Construction, Inc.,* 560 S.W.2d 732, 738 (Tex.Civ.App.1977) (sale of bulk cement in construction contract outweighed by predominant service of building structure). No Texas case addresses whether a distribution agreement is a contract for the sale of goods, but the rule in the majority of jurisdictions is that distributorships (both exclusive and non-exclusive) are to be treated as sale of goods contracts under the UCC. *See Kirby v. Chrysler Corp.,* 554 F.Supp. 743 (D.Md.1982) (automobile dealership) (applying Maryland law); *Quality Performance Lines v. Yoho Automotive, Inc.,* 609 P.2d 1340 (Utah 1980) (automotive parts distribution contract); *Meuse-Rhine-Ijssel Cattle Breeders of Canada,*

---

**3.** Reichek stated the following in an affidavit submitted in support of Sally Beauty's Memorandum in Opposition to Nexxus' Motion for Summary Judgment:

> At no time prior to the execution of the Distribution Agreement did Steve Redding tell me that he was relying upon my personal peculiar tastes and ability in making his decision to award a Nexxus distributorship to Best. Moreover, I never understood that Steve Redding was relying upon my skill and ability in particular in choosing Best as a distributor.
>
> I never considered the Distribution Agreement to be a personal service contract between me and Nexxus or Stephen Redding. I always considered the Distribution Agreement to be between Best and Nexxus as expressly provided in the Distribution Agreement which was written by my brother and me. At all times I conducted business with Nexxus on behalf of Best and not on my own behalf. In

> that connection, when I sent correspondence to Nexxus, I invariably signed it as president of Best.
>
> Neither Stephen Redding nor any other Nexxus employee ever told me that Nexxus was relying on my personal financial integrity in executing the Distribution Agreement or in shipping Nexxus products to Best. ...

Affidavit of Mark Reichek, ¶¶ 19–21, Appellant's Appendix at 189–190.

**4.** It is also possible to read the district court's decision as ruling that all distribution agreements are as a matter of law personal services contracts and therefore nonassignable. For the reasons explained *infra,* we do not believe that this is an accurate statement of the law.

**5.** The parties agree that the contract is governed by the law of Texas. *See Zlotnick v. MacArthur,* 550 F.Supp. 371, 373–74 (N.D.Ill.1982).

*Ltd. v. Y-Tex Corp.*, 590 P.2d 1306 (Wyo. 1979) (cattle semen exclusive dealing contract); *Corenswet v. Amana Refrigeration, Inc.*, 594 F.2d 129 (5th Cir.), *cert. denied*, 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979) (exclusive refrigerator distributorship) (applying Iowa law); *Leibel v. Raynor Manufacturing Co.*, 571 S.W.2d 640 (Ky.App.1978) (exclusive garage door distributorship); *Warrick Beverage Corp. v. Miller Brewing Co.*, 170 Ind.App. 114, 352 N.E.2d 496 (1976) (exclusive beer distribution contract); *Ashland Oil, Inc. v. Donahue*, 159 W.Va. 463, 223 S.E.2d 433 (1976) (gas station dealership); *Aaron E. Levine & Co. v. Calkraft Paper Co.*, 429 F.Supp. 1039 (E.D.Mich.1976) (paper products distributorship) (applying Michigan law); *Artman v. International Harvester Co.*, 355 F.Supp. 482 (W.D.Pa.1973) (truck distribution franchise) (Pennsylvania law). *See also Zapatha v. Dairy-Mart, Inc.*, 381 Mass. 284, 408 N.E.2d 1370 (1980) (dicta); *Brattleboro Auto Sales, Inc. v. Subaru of New England, Inc.*, 633 F.2d 649 (2nd Cir. 1980) (assuming without deciding that Vermont UCC applies to automobile dealership); *Jacob Aronowicz v. Nalley's, Inc.*, 30 Cal.App.3d 27, 106 Cal.Rptr. 424 (2d Dist.1972) (applying UCC to food distributorship without discussion); *Division of Triple T Service, Inc. v. Mobil Oil Corp.*, 60 Misc.2d 720, 304 N.Y.S.2d 191 (S.Ct. 1969), *aff'd*, 34 A.D.2d 618, 311 N.Y.S.2d 961 (1970) (same). *But see Vigano v. Wylain, Inc.*, 633 F.2d 522 (8th Cir.1980) (federal court bound to apply Missouri rule that UCC does not cover distribution agreements).

■ Several of these courts note that "a distributorship agreement is more involved than a typical sales contract," *Quality Performance Lines*, 609 P.2d at 1342, but apply the UCC nonetheless because the sales aspect in such a contract is predominant. *See Corenswet*, 594 F.2d at 134 ("Although most distributorship agreements, like franchise agreements, are more than sales contracts, the courts have not hesitated to apply the Uniform Commercial Code to cases involving such agreements."); *Zapatha*, 408 N.E.2d at 1374–75 n. 8 (courts

have applied UCC to distribution agreements because the sales aspect is predominant). This is true of the contract at issue here (as embodied in the July 24, 1979 letter from Reichek to Redding). Most of the agreed-to terms deal with Nexxus' sale of its hair care products to Best. We are confident that a Texas court would find the sales aspect of this contract dominant and apply the majority rule that such a distributorship is a contract for "goods" under the UCC.

### IV.

■ The fact that this contract is considered a contract for the sale of goods and not for the provision of a service does not, as Sally Beauty suggests, mean that it is freely assignable in all circumstances. The delegation of performance under a sales contract (whether in conjunction with an assignment of rights, as here, or not) is governed by UCC section 2–210(1), Tex. Bus. & Com.Code § 2–210(a) (Vernon 1968). The UCC recognizes that in many cases an obligor will find it convenient or even necessary to relieve himself of the duty of performance under a contract, *see* Official Comment 1, UCC § 2–210 ("[T]his section recognizes both delegation of performance and assignability as normal and permissible incidents of a contract for the sale of goods."). The Code therefore sanctions delegation except where the delegated performance would be unsatisfactory to the obligee: "A party may perform his duty through a delegate unless otherwise agreed to or unless the other party has a substantial interest in having his original promisor perform or control the acts required by the contract." UCC § 2–210(1), Tex.Bus. & Com.Code Ann. § 2–210(a) (Vernon 1968). Consideration is given to balancing the policies of free alienability of commercial contracts and protecting the obligee from having to accept a bargain he did not contract for.

We are concerned here with the delegation of Best's duty of performance under the distribution agreement, as Nexxus ter-

minated the agreement because it did not wish to accept Sally Beauty's substituted performance.[6] Only one Texas case has construed section 2–210 in the context of a party's delegation of performance under an executory contract. In *McKinnie v. Milford*, 597 S.W.2d 953 (Tex.Civ.App.1980, writ ref'd, n.r.e.), the court held that nothing in the Texas Business and Commercial Code prevented the seller of a horse from delegating to the buyer a pre-existing contractual duty to make the horse available to a third party for breeding. "[I]t is clear that Milford [the third party] had no particular interest in not allowing Stewart [the seller] to delegate the duties required by the contract. Milford was only interested in getting his two breedings per year, and such performance could only be obtained from McKinnie [the buyer] after he bought the horse from Stewart." *Id.* at 957. In *McKinnie*, the Texas court recognized and applied the UCC rule that bars delegation of duties if there is some reason why the non-assigning party would find performance by a delegate a substantially different thing than what he had bargained for.

In the exclusive distribution agreement before us, Nexxus had contracted for Best's "best efforts" in promoting the sale of Nexxus products in Texas. UCC § 2–306(2), Tex.Bus. & Com.Code Ann. § 2–306(b) (Vernon 1968), states that "[a] lawful agreement by either buyer or seller for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale." This implied promise on Best's part was the consideration for Nexxus' promise to re-

frain from supplying any other distributors within Best's exclusive area. *See* Official Comment 5, UCC § 2–306. It was this contractual undertaking which Nexxus refused to see performed by Sally.

In ruling on Nexxus' motion for summary judgment, the district court noted: "Unlike Best, Sally Beauty is a subsidiary of one of Nexxus' direct competitors. This is a significant distinction and in the court's view, it raises serious questions regarding Sally Beauty's ability to perform the distribution agreement in the same manner as Best." Memorandum Opinion and Order at 7. In *Berliner Foods Corp. v. Pillsbury Co.*, 633 F.Supp. 557 (D.Md.1986), the court stated the same reservation more strongly on similar facts. Berliner was an exclusive distributor of Haagen-Dazs ice cream when it was sold to Breyer's, manufacturer of a competing ice cream line. Pillsbury Co., manufacturer of Haagen-Dazs, terminated the distributorship and Berliner sued. The court noted, while weighing the factors for and against a preliminary injunction, that "it defies common sense to require a manufacturer to leave the distribution of its products to a distributor under the control of a competitor or potential competitor." *Id.* at 559–60.[7] We agree with these assessments and hold that Sally Beauty's position as a wholly-owned subsidiary of Alberto-Culver is sufficient to bar the delegation of Best's duties under the agreement.

We do not believe that our holding will work the mischief with our national economy that the appellants predict. We hold merely that the duty of performance under an exclusive distributorship may not be delegated to a competitor in the market

---

**6.** If this contract is assignable, Sally Beauty would also, of course, succeed to Best's rights under the distribution agreement. But the fact situation before us must be distinguished from the assignment of contract rights that are no longer executory (*e.g.,* the right to damages for breach or the right to payment of an account), which is considered in UCC section 2–210(2), Tex.Bus. & Com.Code Ann. § 2–210(b) (Vernon 1968), and in several of the authorities relied on by appellants. The policies underlying these two situations are different and, generally, the UCC favors assignment more strongly in the

latter. *See* UCC § 2–210(2) (non-executory rights assignable even if agreement states otherwise).

**7.** The effort by the dissent to distinguish *Berliner* merely because the court there apparently assumed in passing that distributorship agreements were a species of personal service contracts must fail. The *Berliner* court emphasizes that the sale of a distributorship to a competitor of the supplier is by itself a wholly sufficient reason to terminate the distributorship.

place—or the wholly-owned subsidiary of a competitor—without the obligee's consent. We believe that such a rule is consonant with the policies behind section 2–210, which is concerned with preserving the bargain the obligee has struck. Nexxus should not be required to accept the "best efforts" of Sally Beauty when those efforts are subject to the control of Alberto-Culver. It is entirely reasonable that Nexxus should conclude that this performance would be a different thing than what it had bargained for. At oral argument, Sally Beauty argued that the case should go to trial to allow it to demonstrate that it could and would perform the contract as impartially as Best. It stressed that Sally Beauty is a "multi-line" distributor, which means that it distributes many brands and is not just a conduit for Alberto-Culver products. But we do not think that this creates a material question of fact in this case.[8] When performance of personal services is delegated, the trier merely determines that it is a personal services contract. If so, the duty is *per se* nondelegable. There is no inquiry into whether the delegate is as skilled or worthy of trust and confidence as the original obligor: the delegate was not bargained for and the obligee need not consent to the substitution.[9] And so here: it is undisputed that Sally Beauty is wholly owned by Alberto-Culver, which means that Sally Beauty's "impartial" sales policy is at least acquiesced in by Alberto-Culver—but could change whenever Alberto-Culver's needs changed. Sally Beauty may be totally sin-

cere in its belief that it can operate "impartially" as a distributor, but who can guarantee the outcome when there is a clear choice between the demands of the parent-manufacturer, Alberto-Culver, and the competing needs of Nexxus? The risk of an unfavorable outcome is not one which the law can force Nexxus to take. Nexxus has a substantial interest in not seeing this contract performed by Sally Beauty, which is sufficient to bar the delegation under section 2–210, Tex. Bus. Com. Code Ann. § 2–210 (Vernon 1968). Because Nexxus should not be forced to accept performance of the distributorship agreement by Sally, we hold that the contract was not assignable without Nexxus' consent.[10]

The judgment of the district court is AFFIRMED.

POSNER, Circuit Judge, dissenting.

My brethren have decided, with no better foundation than judicial intuition about what businessmen consider reasonable, that the Uniform Commercial Code gives a supplier an absolute right to cancel an exclusive-dealing contract if the dealer is acquired, directly or indirectly, by a competitor of the supplier. I interpret the Code differently.

Nexxus makes products for the hair and sells them through distributors to hair salons and barbershops. It gave a contract to Best, cancellable on any anniversary of the contract with 120 days' notice, to be its exclusive distributor in Texas. Two years later Best was acquired by and merged into Sally Beauty, a distributor of beauty sup-

---

**8.** We do not address here the situation in which the assignee is not completely under the control of a competitor. If the assignee were only a partially-owned subsidiary, there presumably would have to be fact-finding about the degree of control the competitor-parent had over the subsidiary's business decisions.

**9.** Of course, the obligee makes such an assessment of the prospective delegate. If it thinks the delegated performance will be as satisfactory, it is of course free to consent to the delegation. Thus, the dissent is mistaken in its suggestion that we find it improper—a "conflict of interest"—for one competitor to distribute another competitor's products. Rather, we believe

only that it is commercially reasonable that the supplier in those circumstances have consented to such a state of affairs. To borrow the dissent's example, Isuzu allows General Motors to distribute its cars because it considers this arrangement attractive.

Nor is distrust of one's competitors a trait unique to lawyers (as opposed to ordinary businessmen), as the dissent may be understood to suggest.

**10.** This disposition makes it unnecessary to address Nexxus' argument that Sally Beauty breached the distribution agreement by not giving Nexxus 120 days' notice of the Best-Sally Beauty merger.

plies and wholly owned subsidiary of Alberto-Culver. Alberto-Culver makes "hair care" products, too, though they mostly are cheaper than Nexxus's, and are sold to the public primarily through grocery stores and drugstores. My brethren conclude that because there is at least a loose competitive relationship between Nexxus and Alberto-Culver, Sally Beauty cannot—as a matter of law, cannot, for there has been no trial on the issue—provide its "best efforts" in the distribution of Nexxus products. Since a commitment to provide best efforts is read into every exclusive-dealing contract by section 2–306(2) of the Uniform Commercial Code, the contract has been broken and Nexxus can repudiate it. Alternatively, Nexxus had "a substantial interest in having his original promisor perform or control the acts required by the contract," and therefore the delegation of the promisor's (Best's) duties to Sally Beauty was improper under section 2–210(1).

My brethren's conclusion that these provisions of the Uniform Commercial Code entitled Nexxus to cancel the contract does not leap out from the language of the provisions or of the contract; so one would expect, but does not find, a canvass of the relevant case law. My brethren cite only one case in support of their conclusion: a district court case from Maryland, *Berliner Foods Corp. v. Pillsbury Co.*, 633 F.Supp. 557 (D.Md.1986), which, since it treated the contract at issue there as one for personal services, *id.* at 559 (a characterization my brethren properly reject for the contract between Nexxus and Best), is not helpful. *Berliner* is the latest in a long line of cases that make the propriety of delegating the performance of a distribution contract depend on whether or not the contract calls for the distributor's personal (unique, irreplaceable, distinctive, and therefore nondelegable) services. See, e.g., *Bancroft v. Scribner*, 72 Fed. 988 (9th Cir.1896); *Detroit Postage Stamp Service Co. v. Schermack*, 179 Mich. 266, 146 N.W. 144 (1914); *W.H. Barber Agency Co. v. Co-Op. Barrel Co.*, 133 Minn. 207, 158 N.W. 38 (1916); *Paige v. Faure*, 229 N.Y. 114, 127 N.E. 898 (1920). By rejecting that characterization

here, my brethren have sawn off the only limb on which they might have sat comfortably.

A slightly better case for them (though not cited by them) is *Wetherell Bros. Co. v. United States Steel Co.*, 200 F.2d 761, 763 (1st Cir.1952), which held that an exclusive sales agent's duties were nondelegable. The agent, a Massachusetts corporation, had agreed to use its "best endeavors" to promote the sale of the defendant's steel in the New England area. The corporation was liquidated and its assets sold to a Pennsylvania corporation that was not shown to be qualified to conduct business in Massachusetts, the largest state in New England. On these facts the defendant was entitled to treat the liquidation and sale as a termination of the contract. The *Wetherell* decision has been understood to depend on its facts. See *Jennings v. Foremost Dairies, Inc.*, 37 Misc.2d 328, 235 N.Y.S.2d 566, 574 (1962); 4 Corbin on Contracts, 1971 Pocket Part § 865, at p. 128. The facts of the present case are critically different. So far as appears, the same people who distributed Nexxus's products for Best (except for Best's president) continued to do so for Sally Beauty. Best was acquired, and continues, as a going concern; the corporation was dissolved, but the business wasn't. Whether there was a delegation of performance in any sense may be doubted. Cf *Rossetti v. City of New Britain*, 163 Conn. 283, 303 A.2d 714, 718–19 (1972). The general rule is that a change of corporate form—including a merger—does not in and of itself affect contractual rights and obligations. *United States Shoe Corp. v. Hackett*, 793 F.2d 161, 163–64 (7th Cir.1986).

The fact that Best's president has quit cannot be decisive on the issue whether the merger resulted in a delegation of performance. The contract between Nexxus and Best was not a personal-services contract conditioned on a particular individual's remaining with Best. Compare *Jennings v. Foremost Dairies, Inc., supra*, 235 N.Y. S.2d at 574. If Best had not been acquired, but its president had left anyway, as of

course he might have done, Nexxus could not have repudiated the contract.

No case adopts the per se rule that my brethren announce. The cases ask whether, as a matter of fact, a change in business form is likely to impair performance of the contract. *Wetherell* asked this. So did *Arnold Productions, Inc. v. Favorite Films Corp.*, 298 F.2d 540, 543–44 (2d Cir. 1962), and *Des Moines Blue Ribbon Distributors, Inc. v. Drewrys Ltd.*, 256 Iowa 899, 129 N.W.2d 731, 738–39 (1964). *Green v. Camlin*, 229 S.C. 129, 92 S.E.2d 125, 127 (1956), has some broad language which my brethren might have cited; but since the contract in that case forbade assignment it is not an apt precedent.

My brethren find this a simple case—as simple (it seems) as if a lawyer had undertaken to represent the party opposing his client. But notions of conflict of interest are not the same in law and in business, and judges can go astray by assuming that the legal-services industry is the pattern for the entire economy. The lawyerization of America has not reached that point. Sally Beauty, though a wholly owned subsidiary of Alberto-Culver, distributes "hair care" supplies made by many different companies, which so far as appears compete with Alberto-Culver as vigorously as Nexxus does. Steel companies both make fabricated steel and sell raw steel to competing fabricators. General Motors sells cars manufactured by a competitor, Isuzu. What in law would be considered a fatal conflict of interest is in business a commonplace and legitimate practice. The lawyer is a fiduciary of his client; Best was not a fiduciary of Nexxus.

Selling your competitor's products, or supplying inputs to your competitor, sometimes creates problems under antitrust or regulatory law—but only when the supplier or distributor has monopoly or market power and uses it to restrict a competitor's access to an essential input or to the market for the competitor's output, as in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), or *FTC v. Brown Shoe Co.*, 384 U.S. 316, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966), or *United Air Lines, Inc. v. CAB*, 766 F.2d 1107, 1114–15 (7th Cir.1985). See also *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 376–79 (7th Cir.1986). There is no suggestion that Alberto-Culver has a monopoly of "hair care" products or Sally Beauty a monopoly of distributing such products, or that Alberto-Culver would ever have ordered Sally Beauty to stop carrying Nexxus products. Far from complaining about being squeezed out of the market by the acquisition, Nexxus is complaining in effect about Sally Beauty's refusal to boycott it!

How likely is it that the acquisition of Best could hurt Nexxus? Not very. Suppose Alberto-Culver had ordered Sally Beauty to go slow in pushing Nexxus products, in the hope that sales of Alberto-Culver "hair care" products would rise. Even if they did, since the market is competitive Alberto-Culver would not reap monopoly profits. Moreover, what guarantee has Alberto-Culver that consumers would be diverted from Nexxus to it, rather than to products closer in price and quality to Nexxus products? In any event, any trivial gain in profits to Alberto-Culver would be offset by the loss of goodwill to Sally Beauty; and a cost to Sally Beauty is a cost to Alberto-Culver, its parent. Remember that Sally Beauty carries beauty supplies made by other competitors of Alberto-Culver; Best alone carries "hair care" products manufactured by Revlon, Clairol, Bristol-Myers, and L'Oreal, as well as Alberto-Culver. Will these powerful competitors continue to distribute their products through Sally Beauty if Sally Beauty displays favoritism for Alberto-Culver products? Would not such a display be a commercial disaster for Sally Beauty, and hence for its parent, Alberto-Culver? Is it really credible that Alberto-Culver would sacrifice Sally Beauty in a vain effort to monopolize the "hair care" market, in violation of section 2 of the Sherman Act? Is not the ratio of the profits that Alberto-Culver obtains from Sally Beauty to the profits it obtains from the manufacture of

"hair care" products at least a relevant consideration?

Another relevant consideration is that the contract between Nexxus and Best was for a short term. Could Alberto-Culver destroy Nexxus by failing to push its products with maximum vigor in Texas for a year? In the unlikely event that it could and did, it would be liable in damages to Nexxus for breach of the implied best-efforts term of the distribution contract. Finally, it is obvious that Sally Beauty does not have a bottleneck position in the distribution of "hair care" products, such that by refusing to promote Nexxus products vigorously it could stifle the distribution of those products in Texas; for Nexxus has found alternative distribution that it prefers—otherwise it wouldn't have repudiated the contract with Best when Best was acquired by Sally Beauty.

Not all businessmen are consistent and successful profit maximizers, so the probability that Alberto-Culver would instruct Sally Beauty to cease to push Nexxus products vigorously in Texas cannot be reckoned at zero. On this record, however, it is slight. And there is no principle of law that if something happens that trivially reduces the probability that a dealer will use his best efforts, the supplier can cancel the contract. Suppose there had been no merger, but the only child of Best's president had gone to work for Alberto-Culver as a chemist. Could Nexxus have canceled the contract, fearing that Best (perhaps unconsciously) would favor Alberto-Culver products over Nexxus products? That would be an absurd ground for cancellation, and so is Nexxus's actual ground. At most, so far as the record shows, Nexxus may have had grounds for "insecurity" regarding the performance by Sally Beauty of its obligation to use its best efforts to promote Nexxus products, but if so its remedy was not to cancel the contract but to demand assurances of due performance. See UCC § 2–609; Official Comment 5 to § 2–306. No such demand was made. An anticipatory repudiation by conduct requires conduct that makes the repudiating party unable to perform. Farnsworth,

Contracts 636 (1982). The merger did not do this. At least there is no evidence it did. The judgment should be reversed and the case remanded for a trial on whether the merger so altered the conditions of performance that Nexxus is entitled to declare the contract broken.