In re NEDWICK STEEL COMPANY, INC., American Steel Works, Ltd., Debtors.

Nos. 02 B 20292, 02 B 24880.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Jan. 30, 2003.

Kenneth F. Berg, Esq., Ulmer & Berne LLP, Chicago, IL, Richard G. Hardy, Esq. Ulmer & Berne, Cleveland, Ohio, Counsel for Brockhaus.

Robert E. Richards, Esq. Sonnenschein, Nath & Rosenthal, Chicago, IL, Michael S. Haber, Esq., Smith, Gambrell & Russell, LLP, Atlanta, GA, Counsel for Wickeder.

Scott N. Schreiber, Esq., Much, Shelist, Freed, Denenberg, Ament & Rubenstein, P.C., Chicago, IL, Counsel for Debtor.

Nancy A. Peterman, Esq., Greenberg Traurig, P.C., Chicago, IL, Counsel to Creditors Committee.

Stephen G. Wolfe, Esq., Chicago, IL, U.S.Trustee.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON BROCKHAUS' OBJECTION TO ASSIGNMENT OF ITS CONTRACT

JACK B. SCHMETTERER, Bankruptcy Judge.

### PROCEDURAL HISTORY

The above named Debtors filed their related pending Chapter 11 cases in bankruptcy.

Kaltwalzwerk Brockhaus GmbH ("Brockhaus") entered pre-bankruptcy into an exclusive distribution contract with Debtor, Nedwick Steel Company, Inc. ("Nedwick" or "Debtor"). Debtor moved for approval of assignment of that contract. The proposed assignee Wickeder Westfalenstahl Verwaltungs GmbH ("Wickeder") has urged the court to approve that assignment pursuant to a sale

of the Debtor's assets held under 11 U.S.C. § 363. Brockhaus has objected. This dispute became a disputed matter under Rule 9014 Fed.R.Bankr.P. A trial was held and evidence taken. The parties were ordered to submit their final arguments in writing. The Debtor did not participate in the trial to offer evidence, but did appear through counsel in support of Wickeder's position.

Brockhaus argues that an opinion of the Court of Appeals for the Seventh Circuit has prohibited assignment of an exclusive distribution agreement to a direct competitor without consent of the other contracting party. It submits that the contract involved here is unassignable under applicable state law and falls within the exception of 11 U.S.C. § 365(c)(1)(A). Wickeder interprets the precedent otherwise. It contends that it is not a direct competitor in the relevant market, and that even if it is a competitor Brockhaus' rights are limited to receiving adequate assurance that Wickeder will perform under the agreement. Wickeder further contends that the contract between Brockhaus and the Debtor precludes Brockhaus from unreasonably refusing assignment of the contract.

For reasons and based on Findings of Fact and Conclusions of Law made and entered below, it is concluded that the contract is not assignable.

### JURISDICTION

The court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a). The District court has referred this case here pursuant to the standing referral under District Court Internal Operating Procedure 15(a), and this is a core proceeding under 28 U.S.C. §§ 157(A), (N), and (O). Venue is proper under 28 U.S.C. § 1409(a).

### FINDINGS OF FACT

1. Brockhaus is a German corporation, which is a wholly owned by C.D. Walzholz GmbH + Co. KG ("CDW"). CDW's primary business is the manufacture of cold rolled steel strips.

2. Wickeder is German corporation with its principal place of business located in Wickeder (Ruhr). Wickeder's primary business is the manufacture of cold rolled steel strips.

3. The parties have stipulated that CDW and Wickeder are direct competitors.

4. On May 23, 2002, Wickeder filed an involuntary petition against Nedwick Steel Company, Inc. ("Nedwick"). Nedwick consented to the entry of an Order for Relief on June 28, 2002, and converted the case to one under Chapter 11. Concomitantly, its subsidiary American Steel Works, LTD. filed a voluntary Chapter 11 petition, which was administratively consolidated with Nedwick's bankruptcy case.

5. After the bankruptcy filing, Wickeder purchased notes held by American National Bank and Trust Company of Illinois ("ANB") for $8 million, which were secured by all of Nedwick's assets. On August 2.2002, the court entered an Order authorizing the Debtor to sell substantially all of its assets to Wickeder.

6. Nedwick has moved for an Order: (1) authorizing the sale of the debtor's assets pursuant to 11 U.S.C. §§ 363(b); (2) authorizing the assumption and assignment of related executory contracts and unexpired leases; (3) establishing auction procedures; (4) setting sale hearing date; and (5) approving form of notice.

7. Prior to the bankruptcy filings, Brockhaus had a business relationship with Nedwick dating back to the early 1990's. That relationship was formalized in a series of contracts which were execut-

ed by Nedwick and Brockhaus between January and June of 2000. There is a total of four such agreements: (1) the Exclusive Agency Agreement; (2) the Exclusive Agency Agreement Regarding Sales of Product to Breed; (3) the Multi–Year Agreement for Sorbitex Sole Source; and (4) the Exclusive Resellers's Agreement. These agreements make Nedwick the exclusive agent for the sale of Sorbitex products in North America.

8. Sorbitic Steel ("Sorbitex") is used to manufacture seat belt springs in automobiles. There is currently no quality substitute for this application. Brockhaus produced Sorbitex which was then shipped to Nedwick for storage. This allowed Brockhaus to provide just-in-time inventory to its customer Breed, which would order its requirements of Sorbitex from Nedwick.

9. Nedwick earned a 10% commission each time it shipped Sorbitex to Breed. For the years 2000 and 2001, these commissions were approximately $300,000 per year on annual sales of $3 million.

10. Wickeder does not currently manufacture any sorbitic steel products.

11. Further facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### UCC 2–210(2)

Parties do not dispute that these subject contracts are governed by Illinois law.

■ Brockhaus relies upon UCC 2–210(2) as adopted in Illinois for support of its position that the contract is unassignable:

> (2) Except as otherwise provided ... unless otherwise agreed all rights of either seller or buyer can be assigned except where the assignment would materially change the duty of the other

party, or increase materially the burden or risk imposed on him by his contract, or impair materially his chance of obtaining return performance.

810 ILCS 5/2–210(2).

■ Thus, under Illinois law, there are three statutory restrictions on the assignment of contracts: (1) where assignment "would materially change the duty of the other party"; (2) where it would "materially increase the burden or risk imposed on him by his contract"; and (3) where it would "impair materially his chance of obtaining return performance." A fourth restriction is where assignment is precluded by the contract of the parties. *Collins Company, Ltd. v. Carboline Company et al.*, 125 Ill.2d 498, 127 Ill.Dec. 5, 532 N.E.2d 834, 840 (1988). Bankruptcy law modifies the fourth restriction by invalidating agreements that prevent the assignment of executory contracts. *See* 11 U.S.C. § 365(f)(1). However, the Code does not allow assignment of contracts that are unassignable under state law. *See* 11 U.S.C. § 365(c)(1)(A). Brockhaus asserts that this Circuit has interpreted UCC 2–210(2) to prohibit assignment of an exclusive distributorship by one party without the consent of the other party.

Brockhaus relies upon *Sally Beauty*, where the opinion stated that the purpose of § 2–210 is to balance the policy of promoting the free alienablity of contracts with the need to protect the obligee from having to accept "a bargain he did not contract for." *Sally Beauty Co., Inc. v. Nexxus Products Co., Inc.*, 801 F.2d 1001, 1006 (7th Cir.1986). *Sally Beauty* held that the duty of performance under an exclusive distributorship cannot be delegated to a direct competitor without the obligee's consent because such agreements require the obligor to make best efforts to perform, and an obligee in such an arrangement does not bargain for best ef-

forts of his competitor when the contract was entered into. *Id.* at 1007–08. The opinion concluded that, just as in a personal services contract, the risk of impaired performance is too great to allow the delegation of an exclusive distributorship to a competitor of the obligee. *Id.* at 1008.

Wickeder attempts to distinguish *Sally Beauty* on the basis that the opinion applied Texas law. But that argument is without merit. Although Texas law was applied to determine whether the contract in that case should be treated as a services contract or a contract for the sale of goods, the court's analysis was based on the Texas adoption of UCC 2–210(2), which is identical to the same provision adopted in Illinois.

Wickeder also asserts that it is "noteworthy" that *Sally Beauty* relied upon *Berliner Foods Corp. v. Pillsbury Co.*, 633 F.Supp. 557 (D.Md.1986), which involved a personal services contract. But analysis by the Seventh Circuit panel was not predicated on treating all exclusive distribution agreements as a personal services contracts. *See Sally Beauty*, 801 F.2d at 1005 F.4 (rejecting view that all exclusive distribution · agreements are personal services contracts under the law). Rather, it noted that the policy underlying UCC 2–210(2) is the same as that of a personal services contract, which is to protect the obligee's interest in the benefit contracted for.

Wickeder also relies upon *Baxter Healthcare Corp. v. O.R. Concepts, Inc.*, 869 F.Supp. 606 (N.D.Ill.1994), which ruled that UCC 2–210(2) was not violated when the distributor was sold to a competitor of the obligee. But that case is distinguishable on two grounds. First, *Baxter* did not involve an exclusive distributorship. Secondly, there was no assignment involved in *Baxter* because the obligee in

that case was a buyer who objected to being required to purchase products from a firm that was merged into one of its competitors. However, unlike in *Sally Beauty*, the seller in *Baxter* continued to maintain its independent corporate existence after the merger. Hence, *Baxter* reasoned that there was no assignment as in *Sally Beauty*. *Baxter* refused to extend the holding of *Sally Beauty* to a case where there was no change in the parties or the risk of nonperformance:

> ... [T]he Sally Beauty case involved an agreement that provided Best [the distributor] with exclusive distribution rights and it was the distributor that was affected by a change in corporate form. These two facts placed Nexxus in a vulnerable position. Baxter is in no such position. Baxter is still the purchaser of a product which is still available to it, on the same terms that it bargained for, and from the same entity with which it bargained.

*Baxter Healthcare Corp. v. O.R. Concepts, Inc.*, 69 F.3d 785, 791 (7th Cir.1995).

■ Wickeder seeks to analogize the present case to *Baxter* by arguing that the risk posed by the assignment is the same as Brockhaus currently faces from Nedwick since the contracts involved here allow Nedwick to sell non-sorbitic steel products made by other manufacturers. However, Wickeder's argument shows a fundamental misunderstanding of *Sally Beauty*. It does not matter whether an assignee/competitor has the capacity to perform or that it honestly intends to perform under the contract; the purpose of UCC 2–210(2) is to protect a party from being forced to accept performance from a competitor. Therefore, 810 ILCS 5/2–609 [1], which governs the right to adequate

---

**1.** (1) A contract for sale imposes an obligation on each party that the other's expectation of

receiving due performance will not be impaired. When reasonable grounds for inse-

assurance of performance, is inapplicable to cases involving the assignment of an exclusive distributorship to a competitor of the obligee. *Sally Beauty*, 801 F.2d at 1008.

Brockhaus and Nedwick had done business for nearly a decade prior to executing the contract at issue here. During that time, Nedwick had sold non-sorbitic steel products in direct competition with Brockhaus. Thus, Brockhaus was fully aware of the benefits and risk of entering into an exclusive distributorship with Nedwick. Nedwick was a much smaller company, which lacked the engineering skill and production capacity to threaten Brockhaus. But the suggested assignment would place Brockhaus in an exclusive agency relationship with one of its fiercest competitors which rivals it in size, productive capacity, and market power. It is absurd to suggest that the risk of nonperformance by that competitor would be trivial.

In sum, Brockhaus faces the same vulnerability as did the obligee in *Sally Beauty*. If its exclusive distribution agreement is assigned to Wickeder, its direct competitor will have the sole rights to distribute its products in North America for the next three years. As Brockhaus points out, the express terms of the contract would, if assigned, require Wickeder to use its "best efforts" to promote, market and sell Brockhaus' products. Also, Brockhaus would be required to fully cooperate with Wickeder by sharing information on customer contacts, marketing and pricing, strategic planning, product development and engineering. As *Sally Beauty* stated, the risk of an unfavorable outcome is too great and not one which the law can force an obligee to take. *Sally Beauty*, 801 F.2d at 1008.

### Wickeder is a Direct Competitor under UCC 2–210(2)

Further, the risk confronting Brockhaus is not ameliorated by the fact that Wickeder does not currently sell sorbitic steel products. Wickeder urges the court to ignore the stipulation of the parties that they are direct competitors and to focus instead on whether they compete in the market for Sorbitex. However, such an approach ignores commercial reality and would undermine the very purpose of UCC 2–210(2). Under the overly narrow interpretation of UCC 2–210(2) urged by Wickeder, Daimler–Chrysler would be powerless to stop General Motors from becoming the exclusive distributor of Mercedes automobiles in the U.S., since General Motors does not sell a comparable luxury vehicle. This example illustrates that a narrow interpretation of UCC 2–210(2) would eviscerate the statute and reduce its application to cases involving head-to-head competition between the same products. This would shift the balance between free alienability of contracts and protection of the obligee such that nearly all contracts would be assignable, except in extreme cases such as where a company in head-to-head competition with

curity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return. (2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards. (3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance. (4) After receipt of a justified demand failure to provide within a reasonable time not exceeding 30 days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

810 ILCS 5/2–609.

another company bought the rights to distribute a competitor's products with the proven intent of eliminating the competitive threat. Wickeder does not offer any authority for such limited application of UCC 2–210(2). *See Sally Beauty,* 801 F.2d at 1003 (applying a macro approach to determine that parties were direct competitors because they each sold hair care products).

### Brockhaus May Refuse Assignment

Wickeder asserts that Brockhaus' opposition to the assignment is unreasonable, and therefore violates an express provision of the contract that "[n]either party may unreasonably withhold agreement to assignment." However, as stated above, the test under UCC 2–210(2) is not an objective analysis of the reasonableness of the assignment; rather, under *Sally Beauty,* an exclusive distributorship cannot be assigned to a competitor or potential competitor without consent because the obligee has a substantial interest in not accepting a competitor as a delegate under the contract. *Sally Beauty,* 801 F.2d at 1008. A court should not substitute its judgment regarding reasonableness of the proposed assignment for that of Brockhaus. Hence, we must reject the argument that because Wickeder has an economic self-interest in performing under the contract, it would be unreasonable for Brockhaus to refuse assignment of the contract.

Brockhaus is in the best position to determine whether its interests would be adversely affected by the proposed assignment. The dissent in *Sally Beauty* opined that consideration must be given to the weighing the costs and benefits of nonperformance by Wickeder before determining whether to allow the assignment, *Sally Beauty,* 801 F.2d at 1010–11(Posner, J., dissenting), but that reasoning is flawed. Courts should not try to supplant the business judgment of the obligee in deciding how best to protect its interests, since it has superior knowledge and information to make such a decision. Instead of promoting the alienablity of contracts, such an approach would increase the cost of litigation, as parties would be forced to go to trial to decide fact-laden issues. Moreover, such an interpretation of law would induce parties to refuse the power to assign their contracts to avoid these costs and the potential that a court could put them in business with their rival. The better view is that the assignment of exclusive distribution agreement to a competitor of the obligee is presumptively invalid, unless consented to by the obligee.

### CONCLUSION

Authority in this Circuit prohibits assignment of an exclusive distributorship to a competitor of the obligee without its consent. Therefore, a separate order will sustain Brockhaus' objection to the assignment of its exclusive distribution agreement with the Debtor to Wickeder and will deny Nedwick's motion as it pertains to that agreement.